## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : Chapter 7 |
| | : |
| PURSUIT CAPITAL MANAGEMENT, LLC, | : |
| | : Case No. 14-10610 (PJW) |
| Debtor. | : |
| | : **Hearing Date: September 4, 2014 at 2:00 p.m.** |
| | : **Objection Deadline: August 21, 2014 at 4:00 p.m.** |

### MOTION OF CLARIDGE ASSOCIATES, LLC, JAMISCOTT, LLC, LESLIE SCHNEIDER, LILLIAN SCHNEIDER AND THE ESTATE OF LEONARD SCHNEIDER TO COMPEL COMPLIANCE WITH COURT ORDERS AND FOR RELIEF FROM THE AUTOMATIC STAY

Claridge Associates, LLC, Jamiscott, LLC, Leslie Schneider, Lillian Schneider, and the Estate of Leonard Schneider (collectively, the "Claimants"), by and through undersigned counsel, hereby request that this Court enter an Order (a) compelling compliance by Pursuit Capital Management, LLC (the "Debtor") with an order of the Supreme Court of the State of New York (the "State Court"), and (b) granting them relief from the automatic stay to permit them to exercise any and all state-law remedies against the Debtor and various affiliates.  In support of this Motion the Claimants aver as follows:

1.      This is a contested matter in which the Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and the standing order of reference in this district.  Venue is proper in this district pursuant to 28 U.S.C. §1409(a).

2.      This Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (G).

3.      The Claimants invested $7 million in the Pursuit Capital Management Fund I., L.P. (the "Pursuit Fund I" or the "Partnership") in 2007, and currently hold a 35% limited partnership interest in the Pursuit Fund I.  The Pursuit Fund I has not been active since early 2009 and is in run-off.

4.     The Pursuit Fund I is part of the Pursuit hedge fund group comprised of various entities, including various feeder funds and master funds, a general partner (the Debtor here), a broker-dealer (the "Pursuit Broker Dealer"), and an investment advisor (the "Pursuit Investment Advisor"), all controlled and owned by Anthony Schepis ("Schepis") and Francis Canelas, Jr. ("Canelas") (Schepis and Canelas, along with Canelas' wife, the "Insiders").   The Pursuit Investment Advisor acted as an investment manager to the Pursuit Fund I, and the Pursuit Broker Dealer acted, from time to time, as a broker for the Pursuit Fund I.

5.     The Debtor, the Pursuit Investment advisor and the Pursuit Broker Dealer all share the same offices and the same staff, and Schepis and Canelas admit they operate the Pursuit hedge fund group as a "unitary enterprise".   Indeed, Schepis and Canelas readily admit that the various Pursuit entities were and are indistinguishable from Schepis and Canelas.

6.     In testimony given before the Connecticut Superior Court (in an unrelated case brought by the Pursuit Investment Advisor and Pursuit Broker Dealer against UBS, A.G. on behalf of investors in the funds), Schepis repeatedly confirmed that the Pursuit group was, for all intents and purposes, "Anthony Schepis and Frank Canelas":

> THE COURT:   And so [the Pursuit Investment Advisor]; however, is you and Mr. Canelas; is that correct?
>
> Schepis:  Yes.  We are the only two.
>
> THE COURT:  There are only the two.  And you two are also the broker-dealer as Pursuit Partners, LLC; is that correct?
>
> SCHEPIS:  That's correct.
>
> (Transcript at 147-148, relevant portions of which are attached hereto as Exhibit A)

2

\*         \*         \*

> There's not a contractual agreement between [the Pursuit Broker
> Dealer] and [the Pursuit Investment Advisor] investment advisor
> but they are related.  **They are really us**.

(Transcript at 149)

7.      Similar testimony regarding the Debtor was given in the same case by an expert

retained by the Pursuit entities:

> [T]he general partner is [Pursuit] Capital Management which is
> Mr. Canelas, Mr. Schepis.

(Transcript at 85-86).

8.      The Pursuit entities also submitted a brief in that case stating that Pursuit was "a

unitary set" of "tightly-related and enmeshed entities operating for a single purpose" and a

"hedge fund with unitary operations and control." (Memorandum of Law, relevant portions of

which are attached hereto as Exhibit B, at 15).  In reliance on these arguments and testimony, the

court in that case found that the Pursuit entities constitute "a totally integrated structure" and a

"unified or unitary hedge fund structure."  (Memorandum of Decision dated July 3, 2014 at 10, a

true and correct copy of which is attached hereto as Exhibit C).[1]

9.      Thus, the structure of the Pursuit entities was integrated, with Schepis and

Canelas owning and controlling the Debtor, the Pursuit Investment Advisor and the Pursuit

Broker Dealer.

10.      The Debtor was previously the sole general partner of the Pursuit Fund I.  (As

discussed below, in February of this year, Schepis and Canelas, without notice to the remaining

limited partners and in violation of the fund's Amended and Restated Limited Partnership

---

[1] While the decision does not directly concern the Debtor, it leaves no doubt that Schepis and Canelas argued that
their entire group and funds, including the Debtor, were part of this "totally integrated structure."

Agreement (the "Partnership Agreement"), a true and correct copy of which is attached hereto as Exhibit D, secretly replaced the Debtor with a new general partner, Northeast Capital Management LLC ("Northeast"). This was only revealed to the Claimants after the Debtor filed this bankruptcy.)

11.    In September 2012, the Claimants commenced arbitration against the Debtor in New York.  The arbitration was based on numerous actions taken by the Debtor that were a violation of its fiduciary obligations to the Claimants, and enriched the Insiders at the expense of the Claimants and their investments in the Pursuit Fund I.  These included fraudulent transfers to the Insiders, self-dealing, charging grossly excessive and improper fees, and the attempted concealment of this wrongdoing by refusing to prepare audited financial statements or produce lawfully requested books and records.

12.    During the arbitration, the Debtor repeatedly failed and refused to produce discovery, or made only partial, self-serving and incomplete disclosures.  The Debtor failed to comply with various orders and directives of the arbitrator to produce discovery as well as honor its own commitments to do so.  This pattern of conduct not only denied the Claimants information and documents to which they were entitled, but also necessitated multiple hearings and greatly prolonged and increased the expense of the arbitration.

13.    The Arbitration was held in two Phases.  On June 5, 2013, the arbitrator issued a 60 page Decision, Interim Order and Partial Final Award (the "Phase I Award"), finding almost entirely in favor of the Claimants.  The arbitrator found that the Debtor had breached numerous obligations, the Partnership Agreement and its fiduciary duties as the general partner of the Pursuit Fund I, and that the Debtor and Insiders had improperly enriched themselves through self-dealing, assessing improper fees, and other illicit maneuvers by which the Debtor and

4

Insiders lined their own pockets. The arbitrator also awarded Claimants sanctions in the form of attorneys' fees for the Debtor's obstructionist conduct, refusal to produce financial and other records, and for outright misrepresentations made by Debtor to the arbitrator.  A true and correct copy of the Phase I Award is attached hereto as Exhibit E.

14.     The Claimants were awarded a total of $1,481,245.36 in damages against the Debtor under the Phase I Award, including the attorneys' fees award of $192,633.50.  Claimants were also awarded non-monetary relief including the right to an accounting of both the Debtor and the Pursuit Fund I at the Debtor's expense.   The arbitrator noted that the Debtor's "noncompliance with this Tribunal's discovery orders so hampered the process that an independent accounting by a forensic accountant is the only process that has any prospect of ascertaining whether [the Debtor] has committed any additional breaches of duty to Claimants beyond those resolved herein."

15.     In addition to the damage award directly against it, the Debtor, in its capacity as general partner, was further directed to cause the Pursuit Fund I to pay an additional $1,186,346.86 to Claimants.  This amount represents monies of the Claimants that were being improperly withheld in reserve in the Pursuit Fund I by the Debtor for "expenses" that the Debtor refused to enumerate or quantify. The arbitrator found that of the approximately $1.36 million that was being held in reserve, only $175,000 was actually necessary, and ordered the release of the difference from the Pursuit Fund I to the Claimants, as well as payment by the Debtor of $120,308.52 in interest.

16.     Thereafter, Phase II of the arbitration was held.  On December 19, 2013, the arbitrator issued a Decision, Interim Order and Second Partial Final Award (the "Phase II Award", and together with the Phase I Award, the "Awards"), which awarded the Claimants an

5

additional $3,397,847.34 in damages, interest and sanctions against the Debtor for breach of fiduciary duty in conspiring to enable its affiliated Pursuit Broker-Dealer to charge grossly excessive markups rising to the level of "looting" to the Pursuit Fund I.  As the Pursuit Broker-Dealer is wholly owned by Schepis and Canelas, the excessive markups simply ended up in their own personal pockets.  In addition, once again, the Debtor simply refused to produce documents which would have revealed the full extent of its misconduct.  A true and correct copy of the Phase II Award is attached hereto as Exhibit F.

17.    In addition to these findings of wrongdoing, and efforts to conceal the wrongdoing, the Debtor, under the control of Schepis and Canelas, also engaged in secret and fraudulent transfers to strip assets.

18.    Prior to confirmation of the Awards, the Claimants served a subpoena on Wells Fargo seeking the Debtor's complete bank account statements for January-June 2013. These statements revealed that on January 16, 2013, just before the commencement of the Phase I arbitration hearing, the Debtor secretly transferred $645,571.22 from the Pursuit Fund I to its own account and immediately transferred $645,590 to accounts controlled by Schepis, Canelas and by Canelas' wife, Ruth Canelas. [2]

19.    These amounts included an incentive fee that had been assessed by the Debtor against the Claimants in 2011, and that the Claimants were actively disputing in the arbitration. The Debtor represented to the Claimants and the arbitrator that the incentive fee was merely an accrual and had not actually been withdrawn from the Pursuit Fund I, but later was forced to admit that this representation was false, and in fact the funds had been transferred to the Debtor on the eve of the arbitration hearing.  In ruling in the Phase I Award that $328,995 of the amount

---

[2] During the arbitration the Debtor had carefully produced only a single page of its January 2013 account statement which did not reveal the fraudulent transfer from the Debtor to Schepis, Canelas and Canelas' wife.

transferred by the Debtor was wrongly taken as an incentive fee, the arbitrator noted that the Debtor "was less than candid in this arbitration" about the disposition of these funds.

20.    Upon learning of the secret transfer of $645,590 from the Fund to the Insiders, the Claimants sought and obtained a temporary restraining order from the State Court.  The TRO was entered on September 13, 2013, and enjoins the Debtor, *inter alia*, "from transferring in any manner, directly or indirectly, any monies or assets of any kind of [the Fund] to itself, any of its affiliates, subsidiaries, owners or principals, or family members of its owners or principals, or to any associated persons or entities."  A true and correct copy of the TRO is attached hereto as Exhibit G.

21.    After full briefing, the Awards were both confirmed in their entirety by the State Court on January 31, 2014 and February 4, 2014, respectively.

22.    On March 20, 2014, the State Court issued separate judgments against the Debtor in respect of the Awards (the "Judgments").  The Judgments specifically require the Debtor to, *inter alia*, cause the Fund to return $1,186,346 of the Claimants' funds to the Claimants, and to submit to an accounting.  True and correct copies of the Judgments are attached hereto as Exhibit H.

23.    However, by this time, the Debtor had secretly been "removed" as the general partner of the Fund by Schepis and Canelas.

24.    Unbeknownst to the Claimants, on February 14, 2014, after confirmation of the Awards, but before issuance and entry of the Judgments, Schepis and Canelas secretly formed Northeast to be a successor general partner for the Debtor.  Like the Debtor, Northeast is owned, managed and controlled by Schepis and Canelas, and appears to be identical to the Debtor in all respects other than its name.

7

25.     Contemporaneously with Northeast's formation, the Debtor unilaterally withdrew as general partner of the Fund, and Northeast was unilaterally "made" the successor general partner of the Debtor.  This was done without notice to or consent of the Claimants, in violation of the Partnership Agreement, which provides that "[e]xcept . . . with the Consent of the Majority [of the Limited Partners], a General Partner may not retire or withdraw voluntarily from the Partnership or Transfer all or any portion of their General Partnership interests."  Partnership Agreement § 8.01.

26.     Thus, when the State Court issued the Judgments against the Debtor on March 20, 2014, the Debtor had already been removed as the general partner of the Fund, albeit improperly. Neither the Claimants nor the State Court had any idea that this had occurred.

27.     When the Debtor commenced this bankruptcy case on March 21, 2014 it had already been both completely stripped of assets and wrongfully removed as general partner of the Fund.

28.     Claimants did not learn of the existence of Northeast until the 341 meeting in this case, which was held on April 29, 2014.

29.     On or about May 28, 2014, Claimants filed a motion in State Court seeking to add Northeast as a party to the Judgments based on its status as a successor to the Debtor, and to require Northeast to comply with the portion of the Judgments that order the Debtor to cause the Fund to release $1,186,346.86 to the Claimants.

30.     Northeast opposed this motion.  It argued, *inter alia*, that under the Partnership Agreement the Debtor remained liable for all obligations and responsibilities incurred prior to its withdrawal as general partner of the Fund:

> If a General Partner shall cease to be a general partner of the Partnership, such General Partner shall be and remain liable for all obligations and liabilities

8

incurred by it as a General Partner prior to the time such withdrawal shall have become [sic] effective.

Partnership Agreement § 8.03.  Thus, Northeast argued that because Claimants had already obtained confirmation of the Awards against the Debtor prior to its withdrawal, they were limited to seeking relief from the Debtor, and should seek such relief "in the Delaware Bankruptcy Court."

31.    Claimants' motion to add Northeast as a party to the Judgments was denied by the State Court on June 25, 2014 because it was "not a party to the arbitration".

### RELIEF REQUESTED

32.    Unsurprisingly given the foregoing history, the Debtor has not done any of the things required of it by the Judgments.  It has steadfastly refused to cause the Pursuit Fund I to release the $1,186,346.86 improperly held in reserve or to submit to an accounting. Instead, Schepis and Canelas have actively and blatantly delayed and obstructed the Claimants' lawful collection efforts, by transferring significant assets from the Debtor to themselves and to Canelas' wife, Ruth Canelas, by purporting to replace the Debtor with Northeast as the Fund's general partner, by refusing to disclose the Debtor's books and records, and through this bankruptcy filing.

33.    The Claimants seek relief from this Court to stop these abuses.  They first ask this court to order the Debtor and/or the Trustee to immediately comply with the portion of the Phase I Award that requires the Debtor to cause the Pursuit Fund I to return $1,186,346.86 of the Claimants' money and to provide an accounting.

9

34.    In addition, they ask the Court to grant relief from stay so that Claimants may file the complaint attached hereto as <u>Exhibit I</u> (or a substantially similar complaint)[3] seeking the following state law relief:

(a) reversing fraudulent transfers from the Pursuit Fund I and the Debtor to the Insiders;

(b) holding accountable and liable for the Insiders' misconduct the self-described "unitary enterprise" run by Schepis and Canelas; and

(c) obtaining the production of books and records and such other post-judgment discovery as is necessary and appropriate to enforce the Judgments against the Insiders and their affiliated "unitary enterprise".

<u>**Compliance with Phase I Award**</u>

35.    The Phase I Award unequivocally provides that $1,186,346.86 of the amounts currently in the Pursuit Fund I belong to the Claimants, and directs the Debtor to cause this amount to be paid to the Claimants.  Under the TRO, the Debtor is prohibited from doing anything else with these funds, and the funds do not constitute property of the estate.  *See, e.g.,* *In re Priestley*, 93 B.R. 253, 261 (Bankr. D.N.M. 1988) ("[t]he . . . limited partnership and its assets are not property of the estate [of the general partner].  Therefore, the automatic stay does not prevent actions by the limited partners (or anyone else) against the limited partnership itself.") (citations omitted).

36.    The Phase I Award further orders the Debtor to provide an accounting of itself and of the Pursuit Fund I.

---

[3] Exhibits to the complaint are voluminous and have been omitted.

37.     As discussed above, the Claimants have already sought to obtain this relief from Northeast on the basis that Northeast is the successor to the Debtor and is controlled by the same individuals, Schepis and Canelas, as the Debtor.

38.     In opposing the Claimants' Motion, Northeast expressly took the position that the Debtor remains obligated for all of the relief awarded by the Judgments, and that the Claimants should seek to enforce this relief before this Court.

39.     Claimants are now doing as Northeast suggested.  The Judgments represent valid final orders of the State Court that cannot be relitigated in this forum.  *See, e.g.*, *In re Briarpatch Film Corp.*, 281 B.R. 820, 829 (Bankr. S.D.N.Y. 2002) ("Bankruptcy courts must respect the orders and judgments of State courts and cannot act as a court of review or appeal as to matters that have been decided by State courts with jurisdiction.").  The issues of the Debtor's obligation to cause the Pursuit Fund I to release the Claimants' money to them, and to provide an accounting, have been determined.  All that remains is for the Debtor to do what it was ordered to do by the State Court.

40.     Accordingly, the Claimants respectfully request that the Court direct the Debtor and/or the Trustee, as appropriate, to comply with the Phase I Award.

## Relief From Stay

41.     Claimants also seek relief from stay to pursue their state law remedies as judgment creditors of the Debtor by filing the attached (or substantially similar) complaint in State Court.  In order to obtain such relief the Debtor must be added as a party or as a nominal party.  The need to involve the Debtor in such capacity constitutes cause for relief from stay.

42.     In pertinent part, Section 362(d) of the Bankruptcy Code provides "[o]n request of a party-in-interest and after notice and a hearing, the court shall grant relief from the stay

11

provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay (1) for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d).

43.     Courts conduct a "fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether  sufficient cause exists to lift the stay." *In re Downey Financial Corp.*, 428 B.R. 595, 608-09 (Bankr. D. Del. 2010).  Delaware bankruptcy courts weigh "(1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits."  *Id.* at 609.

44.     All three of the foregoing factors weigh in favor of granting relief from the automatic stay.

45.     The bankruptcy estate will not be prejudiced by granting this relief, as the Debtor has already been stripped of any assets, and the Claimants are not seeking to enforce the Judgments against the estate but against the Insiders and other entities and individuals that are not in bankruptcy.

46.     The "balance of hardships" also favors the Claimants.  To date Schepis and Canelas have succeeded in preventing the Claimants from collecting the amounts owed to them through various machinations, the most recent of which is a bankruptcy filing on behalf of the Debtor, an entity with no assets and essentially two creditors.  If Claimants are not permitted to move forward with their lawsuit, they will continue to be stymied in their legitimate collection efforts.  On the other hand, there would be no hardship to the Debtor from lifting the stay, as it is a defunct entity with no operations or assets.

47.     Finally, Claimants believe they have a strong probability of prevailing on the merits of their suit.  As set forth at length in the complaint, the Insiders have made at least two egregious fraudulent transfers to themselves, and Claimants believe that more will be uncovered once they are permitted to review the Debtor's and the Fund's books and records. Further, Schepis and Canelas have admitted that the Pursuit hedge fund group operates as a "unitary enterprise" and that the various entities (among which Schepis and Canelas have moved money) are, in fact, indistinguishable from themselves.  Claimants believe they will have little difficulty proving the allegations in the complaint.

48.     Accordingly, they ask that the Court grant relief from stay to permit the Claimants to proceed with their lawsuit and efforts to collect the Judgments.


[Remainder of this Page Intentionally Left Blank]

WHEREFORE, the Claimants respectfully request that this Court enter an Order (i) directing the Debtor and/or the Trustee to comply with the portions of the Phase I Award specified herein, (ii) granting it relief from the automatic stay for the purposes set forth herein, and (iii) granting such other and further relief as is appropriate under the circumstances.

Dated: August 4, 2014                    Respectfully submitted,

By:   DILWORTH PAXSON LLP

       /s/ Jesse N. Silverman
       Lawrence McMichael
       Christie Comerford
       Jesse Silverman (DE #5446)
       1500 Market Street, Suite 3500E
       Philadelphia, PA 19102
       Telephone: (215) 575-7284
       Facsimile: (215) 575-7200

       -and-

       One Customs House, Suite 500
       704 King Street
       Wilmington, Delaware  19801
       Telephone:  (302) 571-9800
       Facsimile:  (302) 571-8875

       *Attorneys for Claridge Associates, LLC,*
       *Jamiscott, LLC, Leslie Schneider, Lillian*
       *Schneider and the Estate of Leonard Schneider*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August 2014, a true and accurate copy of the foregoing Motion to Compel Compliance with Court Order and for Relief From The Automatic Stay was served upon the persons listed below through the Court's ECF system and by first class mail.

**Stuart M. Brown**
**Gregg M. Galardi**
DLA Piper LLP
1201 North Market Street
Suite 2100
Wilmington, DE 19801

**Jeoffrey L. Burtch, Trustee**
Cooch & Taylor
824 Market Street Mall, Suite 1000
P. O. Box 549
Wilmington, DE  19899

**United States Trustee**
844 King Street, Room 2207
Lockbox #35
Wilmington, DE  19899-0035

**Mark E. Felger**
Cozen O'Connor
1201 N. Market Street, Suite 1001
Wilmington, DE 19801

 /s/ Stephanie Lisko
Stephanie Lisko, Paralegal

116639545_6