**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| PURSUIT CAPITAL MANAGEMENT, LLC, | : | |
| | : | Case No. 14-10610 (PJW) |
| Debtor. | : | |
| | : | |

**EMERGENCY MOTION OF CLARIDGE ASSOCIATES, LLC, JAMISCOTT, LLC, LESLIE SCHNEIDER, LILLIAN SCHNEIDER AND THE ESTATE OF LEONARD SCHNEIDER TO FIND THE DEBTOR REMAINS GENERAL PARTNER OF THE PURSUIT CAPITAL MANAGEMENT FUND I, L.P. AND TO COMPEL COMPLIANCE WITH COURT ORDERS AND REPRESENTATIONS OF THE DEBTOR**

Claridge Associates, LLC, Jamiscott, LLC, Leslie Schneider, Lillian Schneider, and the Estate of Leonard Schneider (collectively, the "Claimants"), by and through undersigned counsel, hereby request that this Court enter an Order:

(1) that Debtor remains General Partner of the Pursuit Capital Management Fund I, L.P. (the "Pursuit Fund I") under the control of the Trustee and that any purported withdrawal by Debtor as General Partner was null and void under the governing Partnership Agreement; and

(2) requiring Debtor and/or the Insiders to immediately transfer to the control of the Trustee for appropriate disposition, $1,186,346.38 which Debtor had been ordered to cause to be paid from the Pursuit Fund I to Claimants prior to the bankruptcy filing, and which funds have been secretly moved by Debtor and/or the Insiders in violation of Court Orders and their own representations at the 341 Hearing.

In support of this Motion the Claimants aver as follows:

1. This is a contested matter in which the Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and the standing order of reference in this district. Venue is proper in this district pursuant to 28 U.S.C. §1409(a).

117578148_1

2.      This Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (G).

## I. THE DEBTOR MAY ONLY WITHDRAW AS GENERAL PARTNER WITH THE CONSENT OF A MAJORITY OF LIMITED PARTNERS, WHICH CONSENT HAS NEITHER BEEN SOUGHT NOR OBTAINED.

3.      The Claimants invested $7 million in the Pursuit Capital Management Fund I, L.P (the "Pursuit Fund I") in 2007. From the time Claimant's made their investment until the eve of the bankruptcy filing, Debtor was the sole General Partner of the Pursuit Fund I. Claimants and Alpha Beta are the sole non-Insider limited partners of the Pursuit Fund I, and collectively hold approximately 70% of the interests in the fund.

4.      Debtor is owned and controlled by two individuals, Frank Canelas, Jr. and Anthony Schepis, (the "Insiders"). Schepis and Canelas have personally appeared in this action to seek the Court's protection in opposing a motion previously filed by Claimants. (*see* Dkt. 25).

5.      The Pursuit Fund I is governed by an amended 2009 Limited Partnership Agreement which was drafted by the Debtor. A true and correct copy of the Partnership Agreement is attached as <u>Exhibit A.</u>

6.      The Partnership Agreement defines Debtor (Pursuit Capital Management LLC) as the General Partner (with "General Partner" in upper case) of the Partnership. (See Partnership Agreement, Ex. A, at p.1.).

7.      Debtor claims to have withdrawn as the General Partner of the Pursuit Fund I on the eve of the bankruptcy filing, and to have substituted another entity Northeast Capital Management, LLC ("Northeast") as the new general partner. Northeast is wholly owned and controlled by the Insiders.

8.      This purported withdrawal as General Partner on the eve of bankruptcy and substitution of a "new" general partner wholly owned and controlled by the Insiders, was

designed to protect the Insiders at the expense of the limited partners, and has meaningful repercussions if effective. First, it prevents the Trustee from acting as General Partner of the Pursuit Fund I and having the rights of the General Partner, including access to records of the Pursuit Fund I that would be highly relevant to the pursuit of a fraudulent conveyance action by Debtor against the Insiders. Second, it further protects the Insiders as the filing of a bankruptcy petition by the General Partner triggers clauses in the Partnership Agreement that would potentially provide for the limited partners to elect a new general partner.

9. In order to accomplish their personal aims, the Insiders attempted to effectuate the withdrawal of the Debtor as General Partner in direct contravention to the terms of the Partnership Agreement. As such the purported withdrawal is ineffective, null and void, Debtor remains General Partner, and the Trustee steps into the shoes of Debtor and takes the powers of the General Partner.

10. Section 8.01 of the Partnership Agreement provides a flat prohibition against the withdrawal of a General Partner without the consent of the majority of the limited partners.

> Section 8.01 <u>Limitation on Withdrawal or Transfer</u>. Except . . . with the Consent of the Majority [of the Limited Partners], **a General Partner may not retire or withdraw voluntarily** from the Partnership or Transfer all or any portion of their General Partnership interests. (emphasis added)

11. At no time did Debtor either seek or obtain the consent of the limited partners to withdraw.

12. While a General Partner may not withdraw without the consent of the limited partners, Section 2.05 of the Partnership Agreement contemplates the possibility that one or more additional general partners can be added to manage the partnership without such consent, granting the General Partner [Debtor] the sole right to admit one or more additional general

3

partners so long as such additional general partner(s) are controlled or primarily owned by the Insiders:

> Section 2.05  <u>Addition of New General Partners</u>.  The General Partner shall have the sole and exclusive right to admit to the Partnership one or more additional general partners if such new general partner or general partners are entities that are controlled by or primarily owned by Anthony Schepis or Frank Canelas [the Insiders.]  Any new general partner that is admitted under this section shall have such duties and responsibilities as assigned by the General Partner, including, but not limited to, the responsibility to act as the Partnership's administrator and / or investment manager.

13.     Notably, Section 2.05 provides only for the admission of additional general partners (lower case "general partners"), and that such additional general partners would have such responsibilities as assigned by the General Partner [Debtor], and does not provide for the withdrawal of the General Partner.

14.     The Partnership Agreement further provides in Section 8.04 that the: "General Partner [Debtor] may also appoint additional general partner(s) or a replacement general partner without the consent of the limited partners."  Section 8.04, which applies to small capital "general partners," is consistent with Section 2.05, which provides for the appointment by the General Partner of additional general partners without the consent of the limited partners and adds that replacement general partners may also be appointed without such consent.

15.     In sum, under Sections 2.05, 8.01 and 8.04 of the Partnership Agreement, the General Partner [Debtor] may appoint additional general partners without the consent of the limited partners, may give such additional general partners such responsibilities as it deems fit, and may replace such general partners, all without consent.  What the General Partner may absolutely not do without the consent of the limited partners is withdraw as the General Partner of the Partnership.  This is the plain language of Section 8.01 of the Partnership Agreement.

16. We understand the Debtor to argue that these provisions of the Partnership Agreement conflict with each other and this gives Debtor the right to simply ignore Section 8.01, preventing its withdrawal without consent of the limited partners. This argument is of no merit.

<u>First</u>, it is not the case that the provisions conflict. Section 8.01 which prevents the withdrawal of the General Partner without consent of the limited partners, does not conflict with the ability of the General Partner to appoint additional general partners, to give such additional general partners responsibilities, or to replace such additional general partners; and no provision says the General Partner may withdraw without consent.

<u>Second</u>, it is black letter law of contract construction that each provision in a contract should be read to have effect and that provisions should be read, wherever possible, so as not to conflict. See *Schuss v. Penfield Partners, L.P.*, No. 3132-VCP, 2008 WL 2433842, 2008 Del. Ch. LEXIS 73, at *18-19 (Del. Ch. June 13, 2008) ("when interpreting a contractual provision, a court attempts to reconcile all of the agreement's provisions when read as a whole, giving effect to each and every term. In doing so, courts apply the well settled principle that contracts must be interpreted in a manner that does not render any provision illusory or meaningless.") (internal quotations omitted); *R&R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, No. 3803-CC, 2008 WL 3846318, 2008 Del. Ch. LEXIS 115, at *12 n.16 (Del. Ch. Aug. 19, 2008) (harmonizing two "seemingly conflicting" contractual provisions and stating "[a] court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.") (internal quotations omitted); *United Rentals, Inc. v. Ram Holdings, Inc.*, 937 A.2d 810, 832 n.102 (Del. Ch. 2007) ("'A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the

instrument when read as a whole.'") (citing to *Counsel of the Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002); *Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.)*, 353 B.R. 77, 87 (Bankr. D. Del. 2006) ("In interpreting a contract, the Court should strive to avoid an interpretation where any provision is rendered meaningless or mere surplusage.").

Third, to the extent there is any conflict, such conflict must be interpreted against Debtor, which drafted the Partnership Agreement and which seeks to exploit the purported conflict by ignoring the provision it does not wish to abide by. *See In re NVF Co.*, 309 B.R. 698, 704-705 (Bankr. D. Del. 2004) ("Delaware contract law states that ambiguous provisions are construed against the drafter"); *Marks v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, No. 07-10416 (KJC), 2011 WL 1811050, 2011 Bankr. LEXIS 1695, at *8 (Bankr. D. Del. May 10, 2011) ("If a contract is ambiguous, the Delaware court will apply the doctrine of contra proferentem against the drafting party and interpret the contract in favor of the non-drafting party."); *Norton v. K-Sea Transp. Partners L.P.,* 67 A.3d 354, 360 (Del. 2013) (holding limited partnership agreements are a contract, and that "[i]f the contractual language at issue is ambiguous and if the limited partners did not negotiate for the agreement's terms, we apply the contra proferentem principle and construe the ambiguous terms against the drafter.").

17.    While Debtor claims to have appointed an additional general partner and withdrawn as General Partner on the eve of bankruptcy, Debtor has never sought and never received the consent of a majority of the limited partners to withdraw, and therefore remains General Partner of the Pursuit Fund I under the clear and enforceable provisions of Section 8.01 of the Partnership Agreement.  The Trustee therefore steps into Debtor's shoes, and is the General Partner of the Pursuit Fund I.

117578148_1

## II. $1,186,346.38 ORDERED TO BE PAID TO CLAIMANTS SHOULD BE TRANSFERRED TO THE TRUSTEE FOR APPROPRIATE DISPOSITION.

18. Pursuant to a final Judgment of the New York State Supreme Court, Debtor has been Ordered to cause the Pursuit Fund I to pay $1,186,346.38 to Claimants. Rather than comply with the Order, Debtor and/or the Insiders secretly and fraudulently transferred these funds to the account of counsel in a separate litigation, in violation of a Court Restraining Order and representations made by Debtor and its counsel at the 341 Hearing. Debtor and/or the Insiders should be ordered to direct this sum to be transferred to the Trustee for appropriate disposition for three reasons:

(A) Debtor, even if it properly withdrew as General Partner (which it has not), remains responsible under Section 8.03 of the Partnership Agreement for all obligations incurred prior to such withdrawal;

(B) Debtor and the Insiders remain bound by the Court Restraining Order prohibiting it from directly or indirectly transferring these funds, other than in compliance with the Judgment or other appropriate court order; and

(C) Debtor and the Insiders are bound by representations made by counsel and Insiders at the 341 Hearing.

19. The relevant facts are as follows. In 2012, Claimants commenced an arbitration against Debtor, alleging, among other things, fraudulent transfers and self-dealing. When the arbitration was brought, Debtor was the sole General Partner of the Pursuit Fund I and no additional general partners had been appointed.

20. The arbitration was held in two phases. We are only concerned here with the Phase I Award, issued by the arbitrator on June 5, 2013, and finding Debtor in breach of the Partnership Agreement and its fiduciary duties. As part of the relief, Debtor was directed to

cause the Pursuit Fund I to pay $1,186,346.38 to Claimants – which sum represented Claimants' own funds being improperly withheld in reserve in the Pursuit Fund I by the Debtor for "expenses" that the Debtor refused to enumerate or quantify.[1]  A true and correct copy of the Phase I Award is attached hereto as <u>Exhibit B</u>.

        21.      After issuance of the Phase I Award, and while competing motions to confirm or vacate the Award were pending, Claimants sought and obtained a Restraining Order from the New York State Supreme Court in order to protect the $1,186,346.86 of Claimants' monies from disappearing at the hands of the Insiders.  At the time the Restraining Order was entered, those funds were held in a bank account of the Pursuit Fund I, held at UMB Bank.  The Restraining Order, issued on September 13, 2013, enjoins Debtor from:

      (a) … transferring in any manner, directly or indirectly, any monies or assets of any kind of the [Pursuit Fund I] to itself, any of its affiliates, subsidiaries, owners or principals, or family members of its owners or principals, or to any associated persons or entities;

      (b) … transferring in any manner, directly or indirectly, any monies or assets of any kind of the [Pursuit Fund I] to anyone or any entity if, as a result of such transfer the assets of the [Pursuit Fund I] would equal an amount less than $1,186,346.

A true and correct copy of the Restraining Order is attached hereto as <u>Exhibit C</u>.

        22.      The Phase I Award was confirmed by the Supreme Court of New York on January 31, 2014, and on March 20, 2014, the State Court issued a judgment against Debtor in

---

[1] Claimants were also awarded $1,481,245.36 against Debtor, including sanctions for Debtor's refusal to produce records, and for misrepresentations made by Debtor to the arbitrator. The arbitrator noted that the Debtor's "noncompliance with this Tribunal's discovery orders so hampered the process that an independent accounting by a forensic accountant is the only process that has any prospect of ascertaining whether [Debtor] has committed any additional breaches of duty to Claimants beyond those resolved herein." (Phase I Award, Ex. B, at 53.)

respect of the Phase I Award. The Phase I Judgment requires the Debtor to cause the Pursuit Fund I to return $1,186,346 of the Claimants' funds. A true and correct copy of the Phase I Judgment is attached hereto as <u>Exhibit D</u>.

23. Debtor has not complied with this Judgment. Rather, it has attempted to avoid its obligations by claiming (in violation of the Partnership Agreement) to have withdrawn as General Partner, and by subsequently transferring the $1,186,346 in violation of the Restraining Order and representations made at the 341 Hearing.

24. On February 14, 2014, after confirmation of the Phase I Awards, the Insiders secretly formed Northeast. Like Debtor, Northeast is owned, managed and controlled by the Insiders. Contemporaneously with Northeast's formation, the Debtor claims (improperly) to have withdrawn as General Partner of the Pursuit Fund I and substituted Northeast as general partner.

25. Claimants learned of the existence of Northeast at the 341 Hearing in this case, held on April 29, 2014. (A true and correct copy of the transcript of the 341 Hearing is attached hereto as <u>Exhibit E</u>). At the 341 Hearing, Debtor and its counsel made repeated representations that the Restraining Order would be complied with, that in no circumstance would the funds at UMB which were the subject of the Restraining Order be moved or otherwise touched, and that in any event, nothing would be done without notifying the Trustee in advance.

26. Mr. Schepis, testifying for the Debtor at the hearing stated:

> **Trustee**: … There are also, my understanding… was that there was also a fund of a million-plus dollars that was somewhere, that the arbitrator had indicated, please don't do anything to that fund. Do you know what I am talking about?
>
> **Schepis**: I do, yes.
>
> **Trustee**: And where is that fund?

> **Schepis**: … The funds… are held at a custody bank. And the arbitration award was a direction to the debtor to pay out those funds.
>
> . . .
>
> **Trustee**: They haven't been moved, right?
>
> **Schepis**: No, they haven't – they haven't been moved. As a matter of fact, there's a temporary restraining order that was issued by a New York Judge, somewhere – I don't remember the exact date, **but there's a TRO on it, so those funds have been in the same place from the very beginning, but can't be moved anyway.**

(Tr. 7:6-8:2 (Ex. E, 341 Hearing) (emphasis added) (*see also* Tr. 29:23-30:2).

27.     Debtor's counsel, Mr. Galardi, was even more definitive that the funds had not, could not, and would not be moved:

> **Trustee**: But the only asset the debtor controlled was the fund, which it no longer controls.
>
> **Mr. Galardi**: And which it couldn't do anything with because there's an injunction precluding it from doing anything with those funds.

Tr. 25:1- 25:5, (Ex. E, 341 Hearing).

> **Mr. Sakin** [Counsel for Claimants]: You've testified that you have no intention of touching the money currently restrained in the UMB Account. Does the new general partner have any intention to touch the money in the UMB Account?
>
> **Mr. Galardi**: Again, "intend to touch". We've directed them no to withdraw any money from those funds…
>
> **Mr. Sakin**: Okay. So that that money will remain in the UMB Account.
>
> **Mr. Galardi**: Yes, and that's what we told [the Trustee], too.

10

Tr. 32:12 – 32:25; *see also*, Tr. 33:7- 33:9 ("nothing will happen until [the Trustee] knows it"); Tr. 30:6 – 33:14 ("We have no intention to withdraw or have any -- direct those funds.") (Ex. E, 341 Hearing).

28. Subsequent to making these representations, on June 30, 2014, the Insiders secretly directed UMB Bank to transfer all funds in the account to the escrow account of Burg, Simpson, Eldridge, Hersch & Jardine, P.C. ("Burg Simpson"), counsel for entities affiliated with the Insiders in another litigation pending in state court in Connecticut. The Trustee was not informed of this fraudulent conveyance, neither were Claimants, nor was any motion filed for relief from the Restraining Order. A copy of the instructions from the Insiders to UMB to transfer the funds is attached as Exhibit F.

29. The Insiders, in directing the transfer of the funds to Burg Simpson, clearly have demonstrated the ability to direct the transfer of these funds and the willingness to do so for their own advantage.

    **A.    Under Section 8.03 of the Partnership Agreement, the Debtor Remains Responsible for All Obligations Incurred Prior to Its Purported Withdrawal.**

30. As discussed above, Debtor has not withdrawn as General Partner. However, even if the Debtor were to be found to have withdrawn, Debtor remains fully responsible under the Partnership Agreement for all obligations incurred prior to its withdrawal.

31. Section 8.03 of the Partnership Agreement provides Debtor remains liable for all obligations and responsibilities incurred prior to its withdrawal as General Partner of the Fund. This Section states:

> Section 8.03. Liability of Withdrawing General Partner. If a General Partner shall cease to be a general partner of the Partnership, such General Partner shall be and remain liable for all obligations and liabilities incurred by it as a General Partner prior to the time such withdrawal shall have become [sic] effective.

32.  Notably, this provision does not apply only to liabilities, but to liabilities and <u>obligations</u>.  In short, this provision acts to prevent a General Partner from skipping out on its obligations even through an effective withdrawal, properly done with the consent of the limited partners...

33.  Here, the obligation to cause the Pursuit Fund I to pay the $1,186,346 to Claimants and the entry of the Restraining Order, all occurred prior to any purported withdrawal (effective or not) of Debtor as General Partner – and Debtor remains responsible for this obligation.

34.  This is a point with which the Insiders agree.  After learning of the additional general partner, Northeast, at the 341 Hearing, Claimants filed a motion in New York State Supreme Court seeking to add Northeast as a party, and to require Northeast to comply with the Judgment to cause the Pursuit Fund I to pay $1,186,346.  Northeast, represented by the same law firm who represents Debtor, successfully opposed this motion.  In so doing, it specifically argued that the stay applied, and that under Section 8.03 of the Partnership Agreement the Debtor remained liable for all obligations and responsibilities incurred prior to its withdrawal as General Partner of the Pursuit Fund I.  (See Memorandum of Law of Northeast in Opposition to Motion to Add a Petitioner, attached as Exhibit G, at 9-10).

35.  Therefore, Debtor remains liable for the obligation to comply with the Restraining Order and to cause the Pursuit Fund I to pay $1,186,346 to Claimants.  As the Trustee has stepped into the shoes of Debtor, Debtor and/or the Insiders should be ordered to transfer these funds to the Trustee for appropriate disposition.

### B. Debtor and the Insiders Are Bound by the Restraining Order.

36. The Restraining Order specifically enjoined Debtor, *directly or indirectly*, from transferring the funds to Burg Simpson for the prosecution of a separate lawsuit. We understand Debtor to be arguing that Debtor did not direct the transfer, but that Northeast or one of the Insiders directed the transfer. Northeast is wholly owned by the Insiders. The Restraining Order clearly enjoins the Debtor from acting directly or indirectly. Acting through Northeast or through the Insiders personally clearly violates the Restraining Order's prohibition against conduct, taken "directly or indirectly" that would violate the Order. (*See Mead Johnson & Co. v. Rosen*, 16 A.D. 2d 337 (N.Y. App. Div. 1st Dep't 1962); *Quinter v. Volkswagen*, 676 F.2d 969, 972 (3d Cir. 1982) ("A person who is not a party to a proceeding may be held in contempt if he or she has actual knowledge of a court's order and either abets the defendant or is legally identified with him"); *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990)).

37. Therefore, the Restraining Order has been violated by Debtor and the Insiders. Debtor and the Insiders retain the ability to direct these funds.

38. As the Trustee has stepped into the shoes of Debtor, these funds should be ordered transferred to the Trustee for appropriate disposition.

### C. Debtor is Bound by the Representations Made at the 341 Hearing.

39. Debtor and its counsel made clear representations at the 341 Hearing that the Restraining Order would be complied with, and that no funds would be moved. Instead, acting through either Northeast or the Insiders, the funds were secretly moved.

40. This Court has inherent power to enforce Debtor and the Insiders to comply with representations made during these proceedings. *Zebrowski v. Hanna*, 973 F.2d 1001, 1004 (1st Cir. 1992) (Upholding trial court's order requiring litigants to "live up to their past promise" and

holding that "[a] court has inherent power to regulate the litigation before it" and "has the legal power to estop parties from breaking promises that counsel makes on their behalf." (Breyer, C.J.)

41.     Debtor and the Insiders retain the ability to direct these funds. As the Trustee has stepped into the shoes of Debtor, these funds should be ordered transferred to the Trustee for appropriate disposition.

## RELIEF REQUESTED

42.     Accordingly, the Claimants respectfully request that the Court:

(a) enter an Order that Debtor remains General Partner of the Pursuit Capital Management Fund I, L.P. (the "Pursuit Fund I") under the control of the Trustee and that any purported withdrawal by Debtor as General Partner was null and void under the governing Partnership Agreement; and

(b) requiring Debtor and/or the Insiders to immediately transfer to the control of the Trustee for appropriate disposition, $1,186,346.86 which Debtor had been ordered to cause to be paid from the Pursuit Fund I to Claimants.

43.     With regard to relief sought against the Insiders, this Court has the authority to direct the Insiders to transfer the funds to the Trustee on multiple bases: (i) pursuant to its inherent power over Insiders of a Debtor; (ii) because the Insiders have personally appeared in this action and sought the protection of this Court in Opposition to a prior motion filed by Claimants (*see* Dkt. 25); (iii) because Mr. Schepis appeared at the 341 Meeting and made representations and the Court may enforce compliance with such representations; and (iv) because a Restraining Order against a party may be enforced against Insiders of that party and other entities controlled by those Insiders.

117578148_1

WHEREFORE, the Claimants respectfully request that this Court enter an Order granting the relief requested above and granting such other and further relief as is appropriate under the circumstances.

Dated: September 12, 2014                                   Respectfully submitted,

By:  DILWORTH PAXSON LLP

/s/ Jesse N. Silverman
Lawrence McMichael
Christie Comerford
Jesse Silverman (DE #5446)
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7284
Facsimile: (215) 575-7200

-and-

One Customs House, Suite 500
704 King Street
Wilmington, Delaware  19801
Telephone:  (302) 571-9800
Facsimile:  (302) 571-8875

*Attorneys for Claridge Associates, LLC, Jamiscott, LLC, Leslie Schneider, Lillian Schneider and the Estate of Leonard Schneider*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of September 2014, a true and accurate copy of the foregoing Emergency Motion to Find the Debtor Remains General Partner of the Pursuit Capital Management Fund I, L.P. and to Compel Compliance with Court Orders and Representations of the Debtor was served upon the persons listed below through the Court's ECF system and by first class mail.

|  |  |
|---|---|
| Jeoffrey L. Burtch<br>Cooch & Taylor<br>824 Market Street Mall, Suite 1000<br>Wilmington, DE  19899 | United States Trustee<br>844 King Street, Room 2207<br>Lockbox #35<br>Wilmington, DE  19899-0035 |
| Stuart M. Brown<br>Gregg M. Galardi<br>DLA Piper LLP<br>1201 North Market Street, Suite 2100<br>Wilmington, DE 19801 | Mark E. Felger<br>Cozen O'Connor<br>1201 N. Market Street, Suite 1001<br>Wilmington, DE 19801 |

   /s/ Stephanie Lisko
Stephanie Lisko, Paralegal