```
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
 2

 3                                   .    Chapter 11
     IN RE:                          .
 4                                   .    Case No. 14-10610 LSS
     PURSUIT CAPITAL MANAGEMENT, LLC,.
 5                                   .
                   Debtor.           .
 6   . . . . . . . . . . . . . . .   .    Courtroom No. 2
     CLARIDGE ASSOCIATES, LLC        .    824 Market Street
 7   JAMISCOTT LLC, LESLIE SCHNEIDER,.    Wilmington, Delaware 19801
     And LILLIAN SCHNEIDER,          .
 8   COLLECTIVELY as the CREDITORS,  .
     TRANSFEREES, and ASSIGNEES of   .
 9   the ESTATE OF PURSUIT CAPITAL   .
     MANAGEMENT, LLC                 .
10                                   .
                   Plaintiffs,       .
11                                   .
        v.                           .
12                                   .
     ANTHONY SCHEPIS, FRANK CANELAS, .
13   RUTH CANELAS, NORTHEAST CAPITAL .
     MANAGEMENT, LLC, PURSUIT        .
14   PARTNERS, LLC, PURSUIT          .
     INVESTMENT MANAGEMENT, LLC,     .
15   PURSUIT CAPITAL MANAGEMENT      .
     FUND I, L.P., PURSUIT CAPITAL   .
16   PARTNERS (Cayman), LTD.,        .
     PURSUIT CAPITAL MASTER (Cayman) .
17   LTD., PURSUIT OPPORTUNITY FUND I.
     L.P., PURSUIT OPPORTUNITY FUND I.
18   MASTER LTD.,                    .
                                     .
19                 Defendants.       .
     . . . . . . . . . . . . . . .   .
20
                     TRANSCRIPT OF HEARING
21         BEFORE HONORABLE LAURIE SELBER SILVERSTEIN
                UNITED STATES BANKRUPTCY JUDGE
22
     APPEARANCES:
23
     For the Defendants:     R. Craig Martin, Esquire
24                           DLA PIPER
                             1201 North Market Street
25                           Wilmington, Delaware 19801
```

```
 1   APPEARANCES: (Continued)

 2   For Claridge:              Wendy Reilly, Esquire
                                DEBEVOISE & PLIMPTON
 3                              919 Third Avenue
                                New York, New York 10022
 4


 5
     Audio Operator:            Michael Miller
 6
     Transcription Service:     Reliable
 7                              1007 N. Orange Street
                                Wilmington, Delaware 19801
 8                              Telephone:  (302) 654-8080
                                E-Mail:  gmatthews@reliable-co.com
 9

10   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

<u>INDEX</u>

2

<u>Page</u>

3
4
5
6

NOTICE OF HEARING ON DEFENDANTS' MOTION TO DISMISS COMPLAINT
ON JURISDICTIONAL GROUNDS (D.I.7) AND DEFENDANTS' MOTION TO
STRIKE PORTIONS OF THE DECLARATION OF WENDY B. REILLY, ESQ.
IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT ON JURISDICTIONAL GROUNDS
(D.I.29).

7

<u>ARGUMENT:</u>

8

By Mr. Martin                                              4

9

By Ms. Reilly                                            56

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence 10:00 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Please be seated.

4                Okay.  We're here on the motion to dismiss in

5    Pursuit.  Mr. Martin.

6                MR. MARTIN:  Thank you, Your Honor.  I'll just

7    proceed with argument.  I note that we did submit completion

8    of briefing and then Your Honor asked for argument, so I'm

9    just going to proceed with the argument I've prepared.  And,

10   obviously, if the Court has specific questions, I'll prefer

11   to answer those.  But I can do that either at the outset or

12   along the way.

13               THE COURT:  No, I will -- I do have questions for

14   both parties, but proceed.

15               MR. MARTIN:  Okay.  Thank you, Your Honor.

16               Your Honor, I wanted to start with just a bit of

17   the run through of some of the relevant facts, because we've

18   been here a lot in front of this Court on procedural issues

19   and bankruptcy related issues, but we really haven't talked

20   ab out a lot of the substance between the parties.  And I

21   think it would help to understand it a little bit better.

22   And I want to make sure that we have kind of a framework.

23               And the reason I want to do that is because the

24   Plaintiffs here, purporting to act on behalf of a general

25   partner of a partnership, actually invested in a single

1  entity called the Pursuit Opportunity Fund I.

2          THE COURT:  Well, let me ask you before we start

3  and I'll let you do, but are these going to be facts that are

4  different than what's in the complaint?

5          MR. MARTIN:  Your Honor, the facts that I'm

6  relying on are in the complaint or are in the Judge Failla

7  decision that we attached to our reply brief or our reference

8  in the Judge Genuario's decision that we submitted under

9  letter at the beginning of the month.

10          THE COURT:  And can I consider the facts that are

11  in the other opinions?

12          MR. MARTIN:  Your Honor, I submit that you can,

13  and I will tell you why.

14          First, the Judge Fialla decision deals with claims

15  that are essentially identical in nature, but that she found

16  are being asserted by the Claridge & Jamiscott parties in an

17  individualized basis, not on behalf of the Funds, but the

18  underlying facts are the same.  And so another Federal Court

19  making findings of fact between the same litigants, I submit,

20  the Court can consider.

21          Additionally on the --

22          THE COURT:  Do I have to have some briefing on

23  whether on the theory -- is it *race judicata*, is it

24  *collateral estoppel*?  Or what theory should I consider the

25  facts in those opinions?

1      MR. MARTIN:  So on the Judge Failla decision, the

2  request that we're making is that she's essentially

3  interpreted the limited partnership agreement to determine

4  that the disputes are, in fact, subject to the arbitration

5  clause.

6      THE COURT:  I'm not sure I read it that way.  So

7  we'll talk about that.

8      MR. MARTIN:  And then on the Judge Genuario's

9  decision, the Plaintiffs allege in paragraph 8 of their

10  complaint that they've been authorized by Alpha Beta to

11  prosecute this action.

12      The Judge Genuario decision is a decision between

13  Alpha Beta and some of these same Defendants that deals with

14  the -- also the interpretation of the limited partnership

15  agreement and whether there should have been payment of a

16  carried interest.

17      And this complaint seeks, in large part, asserts

18  essentially two claims.  One, a transfer of $645,000.00

19  dollars, and then the second claim is that when there was a

20  replacement partner put in place that that resulted in this

21  Debtor not having access to its carried interest.

22      And Judge Genuario's decision says that no carried

23  interest is owing as a result of the UBS Litigation because

24  the value of the UBS litigation did not cross what's called

25  the high-water mark, which means that although there is money

1  available for the UBS action, it doesn't rise above what the

2  original book value was such that the general partner would

3  have been entitled to a carried interest.

4         And so, again, a contractual interpretation by a

5  Court dealing with the same issue with respect to the same

6  parties, we believe the Court is relevant to the Court's

7  decision on the motion that we filed.

8         THE COURT:  Okay.  We may need some briefing on

9  that post -- and I recognize that that decision, obviously,

10  came down after all of this briefing, so that's why it wasn't

11  included.  But we may need some briefing if the parties do

12  not agree on that point as to its binding effect, its

13  persuasive effect, its whatever effect on the estate and its

14  causes of action.

15         MR. MARTIN:  And certainly if Your Honor wants

16  that, we're happy to do that.  That's one of the reasons why

17  we provided the decisions that we did so that Your Honor

18  would be aware of them and I wouldn't be springing this on

19  from the podium today.

20         THE COURT:  I appreciate that.

21         MR. MARTIN:  So, again, I want to -- it's

22  important to appreciate that the Plaintiffs -- and maybe I'll

23  skip some of the factual background because it sounds like

24  Your Honor has read the complaints and the decisions and so I

25  don't want to belabor that point.

1          THE COURT:  I'm happy to hear your background.

2          MR. MARTIN:  Okay.  Great.

3          Essentially, Pursuit Capital Fund was formed in

4    August 2004 and the Schneider entities began investing in

5    2006.  There was a separate fund called the Pursuit

6    Opportunity Fund I that was formed.  And if you look at the

7    complaint, I think it's useful just kind of walkthrough who

8    the parties are.

9          Obviously, Mr. Schepis and Mr. Canelas are the

10   ultimate principles of both the Debtor and indirectly some of

11   the other Pursuit parties.  Ms. Canelas is the wife of Mr.

12   Canelas and I guess she got sued because her name is on the

13   bank account into which some money got deposited.  So I guess

14   they thought it was appropriate to go after the spouses as

15   well.

16         Northeast Capital Management is the replacement

17   general partner.  That's the party that was put in place of

18   the Debtor with respect to the Funds.  So the Debtor of

19   Pursuit Capital Management, was the general partner of

20   Capital Fund I.

21         You then have Pursuit Partners, LLC.  That is a

22   broker dealer entity, a registered broker dealer that

23   actually executes trades.  So think of that as you know, the

24   Merrill Lynch for these funds except that it's owned by Mr.

25   Schepis and Canelas, ultimately.  And, you know, it's the one

1  that actually calls the phone and executes trades with

2  counterparties on behalf of the Funds.

3        You then have Pursuit Investment Management, LLC.

4  That's what's called an investment manager.  Essentially, the

5  Fund at issue, sign a contract with an investment manager who

6  then sets the investment strategy for the Funds, decides, you

7  know, what to hedge, what securities to buy, et cetera.

8        And then from there, you have Pursuit Capital

9  Management Fund I, L.P., which is the entity in which the

10 Plaintiffs have invested.  And that Fund, along with the

11 Capital Partners Cayman Limited are what are called feeder

12 funds.  One is onshore, the Delaware entity, and one is

13 offshore, the Cayman entity.  And they then feed up into the

14 Pursuit Capital Master Cayman Limited Fund, which is where

15 the assets would have been pulled and the investments are

16 made from them.

17       You then have a similar structure with the onshore

18 and offshore Fund with something called the Pursuit

19 Opportunity Fund and the Pursuit Opportunity Fund I Limited.

20 And those then go up in the Pursuit Opportunity Fund I Master

21 Limited.

22       I wanted to walk you through that because I think

23 it's important to appreciate that the contractual

24 relationship between the Claridge Associates, Jamiscott, the

25 Schneiders is only with Pursuit Capital Onshore Fund.  They

1  signed a limited partnership agreement with one of these

2  investment entities.  And one of the things that causes our

3  client great trouble is that they've just sued everyone

4  including the other Funds that have other limited investors

5  in them.  And we assume that they want to take the money that

6  would, otherwise, go to those investors and shift it over to

7  the Capital Fund.

8              THE COURT:  So two questions there.

9              Who are the other investors?  Anybody other than

10  Mr. Canelas and Mr. Schepis?

11              MR. MARTIN:  There are -- I don't think the record

12  reflects who all the other investors are.  There's Alpha

13  Beta, obviously, which is alleged to have delegated their

14  rights in this suit to the Plaintiffs today.  There are Mr.

15  Canelas and Mr. Schepis.  And then I think there's a few

16  other entities that had third parties, a very small interest.

17  I don't want to overstate it that have an interest in this.

18              But it's important to appreciate that because of

19  the financial crisis in 2008, while as the complaint alleges

20  in 2007, they made $2.4 million dollars in management fees.

21  At that time, they had $600 million dollars under Management.

22  As a result of the financial crisis, they decided to put the

23  Fund into a wind down.

24              The Schneiders eventually invested up to $7

25  million dollars.  When they went into the wind down, they

1  created an option for investors to agree to fully be redeemed

2  or to allow some of their mandatory redemption to be put into

3  what's called the side pocket, which had the illiquid assets

4  of the Limited Partnership, which included the UBS action.

5        And parties were given the option to either fully

6  redeem and walk away from the fund, take their principle and

7  their gains.  And actually the interesting thing is that

8  notwithstanding the financial crisis, the principle and some

9  return on the Limited Partners Investment was returned.  So,

10  you know, it's important to appreciate that this is not a

11  situation where somebody put in -- you know, this is not a

12  Fund that you put $10 million dollars in and people only got

13  a million out of it.  They've actually gotten their

14  redemption principle and some return.

15        And then there were illiquid assets that they were

16  given the option to take some of their return, let it be

17  reserved so that the partnership, former partnership could go

18  after those assets and pay the proceeds of those assets to

19  the people that elected to remain invested in the side

20  pocket.

21        And so my client's position is that as a result of

22  that mandatory redemption, there really are no more Limited

23  Partners.  There's only people that have an interest in the

24  side pocketed assets and that interest is governed by the

25  amended Limited Partnership agreement, which is the one that

1  we attached to Mr. Brogan's affidavit, the April 1st Limited

2  Partnership agreement.

3          So it's a little bit confusing to say who are the

4  other Limited Partners because my client's view is they're no

5  longer Limited Partners.  There are former Limited Partners

6  who retained an interest in "side pocketed assets."

7          THE COURT:  I'm not sure that the name of the

8  Connecticut Judge -- I'm not sure he agrees with that, but.

9          MR. MARTIN:  I do not dispute that the arbitrator

10 or Judge Genuario don't necessarily agree with it.  I'm just

11 stating my client's position.

12         THE COURT:  Okay.  So and this is something --

13 again, so you want me to accept the Judge's findings for some

14 things, but not for other things?

15         MR. MARTIN:  No, no I'm not suggesting that Your

16 Honor should approach the decision on the complaint in any

17 way that you otherwise would.  I'm not arguing with Judge

18 Genuario's decision.  It says what it says.  I'm merely

19 stating --

20         THE COURT:  Does it bind me on those points that

21 your client disagrees with?

22         MR. MARTIN:  I think for the purposes of ruling on

23 the motion to dismiss, we would be prepared to not dispute

24 Judge Genuario's findings and allow Your Honor to rely on

25 them like you would as part of the complaint that they should

1  be taken as true for the purposes of your decision on this

2  motion.

3          THE COURT:  Okay.  Again, something I think we're

4  going to have to perhaps take up in post briefing because I

5  appreciate that, but I'm not sure if it binds me or it

6  doesn't.  Well, that's all I need to say on that.

7          MR. MARTIN:  Okay.  Thank you, Your Honor.  I

8  appreciate that.

9          So I then think it's important to understand that

10 after that mandatory redemption and option to stay invested

11 in the Funds that's when the trouble started.  And as Your

12 Honor is aware, there was an arbitration filed.

13          I think it's important to appreciate that as a

14 result of the side pocket, the broker/dealer that I mentioned

15 and the investment manager filed the UBS action.  So that's

16 Pursuit Capital -- Pursuit Partners, LLC and Pursuit

17 Investment Management LLC were the parties originally on the

18 UBS action.

19          And that case was actually dismissed by the Court

20 where it was originally filed in Connecticut on the theory

21 that those parties as broker dealer and investment manager

22 did not actually own the securities because they were

23 deposited in the Funds and, therefore, they did not have an

24 economic interest in the securities and could not prosecute

25 the action.

1        That lawsuit was not reinstated until 2014 when on

2   a motion to reconsider, the Court found that because of the

3   way hedge funds are structured, the economic interest, I kind

4   of compare it to a, you know, Federal Rule of Civil Procedure

5   25: Who has the financial interest in a lawsuit?

6        The Court found that because of the way the hedge

7   fund was structured and because the actual losses were on

8   behalf of the Funds and because the investment manager had an

9   interest in potentially receiving fees that there was

10  sufficient unity of interest on an economic basis for the

11  lawsuit to be reinstated.

12       And on page 37 of Judge Genuario's decision, he

13  makes reference to the fact that that occurred and that that

14  finding of unitary interest was an economic one and is not

15  akin to an alter ego fund.

16       Since the time that the UBS action has been filed,

17  while it was under dismissed status is when this bankruptcy

18  case occurred, the auction, many of the things that happened.

19  I think there have been, including this one, now four

20  lawsuits filed by the Claridge parties.  Additionally, Alpha

21  Beta has filed another lawsuit.  We attached two to Mr.

22  Brogan's affidavit because we find them to be extremely

23  similar to this lawsuit and we find that relevant to the

24  Court's arbitration decision and some of the other arguments

25  we've made in our motion.

1        And so this lawsuit then asserts that based on

2   that unitary interest, all of these Defendants should be

3   subject to liability.  However, they do not plead facts

4   necessary to establish, nor do they assert as a cause of

5   action any kind of veil piercing or alter ego.

6        And so to the extent that we think the lawsuit

7   boils down to a dispute over $645,000.00 transferred to Mr.

8   Schepis and Mr. Canelas or a dispute over whether the

9   replacement general partner going to Northeast was

10  inappropriate.  And should they get any fees, it should be

11  paid to this Debtor rather than to Northeast.

12       Those actions should not be asserted against all

13  of the various other entities with whom neither this general

14  partner nor these Plaintiffs had contractual privity with or

15  any relationship with.  And that, in fact, because there are

16  -- and you can see this in the Judge Genuario decision -- the

17  way the UBS proceeds gets divided.  He divides it between two

18  Funds.  It then goes down to the feeder funds from there.

19       And so adding these Defendants and exposing that

20  portion of the UBS proceeds to the Limited Partners of the

21  Capital Fund takes money away from those other investors and

22  moves it over to the Capital Fund, and we think that's

23  prejudicial.

24       THE COURT:  How does that impact on the motion to

25  dismiss?  Those are defenses, aren't they?

1          MR. MARTIN:  Well because in order to stay the

2    claim against the other Defendants, then the first three, we

3    submit that they've not pled that there's any type of

4    relationship or contract between them.  They essentially lump

5    all of the Defendants in.  And when they talk about, if you

6    look at their complaint; when they talk about the actions

7    taken by the parties, they do not talk about anything

8    specific that the Cayman Funds did, that the Opportunity Fund

9    did.

10          They're talking about actions taken by Mr. Canelas

11   and Mr. Schepis.  And they're talking about Northeast as

12   seeding to the rights of the Debtor.

13          THE COURT:  Where in your motion to dismiss is

14   that argument?

15          MR. MARTIN:  Your Honor, we move to dismiss for

16   the Cayman entities on jurisdiction basis.

17          THE COURT:  Right.

18          MR. MARTIN:  Personal jurisdiction.

19          THE COURT:  Right.

20          MR. MARTIN:  And that they have not pled that

21   there's any purposeful availment of those Cayman entities --

22          THE COURT:  I understand that, but that's not the

23   argument you just made.

24          What I'm asking is where is the argument you just

25   made in the motion to dismiss?

1     MR. MARTIN:  Your Honor, if you give me one

2  moment, I'll look in their opposition brief because they. . .

3     THE COURT:  I just want to make sure that I'm not

4  missing an argument because it's not on my chart.

5     MR. MARTIN:  That's fine.  I appreciate it.

6     And, Your Honor, I think it probably comes up in

7  the jurisdictional argument where we're talking about on page

8  22 of 34 of their opposition brief.  They say the personal

9  jurisdiction is established by the flow of funds to and from

10  the domestic Defendants and the Cayman Defendants.  That's

11  not alleged in the complaint.

12     THE COURT:  Well that's a question I have for

13  them.  But I'm asking where you've moved on the grounds that

14  they haven't stated a claim against your client because they

15  have no contractual relationship with them or they have no

16  other ability to seek a remedy against all Defendants except

17  the first three.

18     MR. MARTIN:  Yeah and, Your Honor, we took them at

19  their pleading.  They said that we're a unitary enterprise.

20  And so we referred to the Limited Partnership agreement that

21  was signed that put the Debtor in places general partner.

22  And that partnership agreement had two provisions to it: one

23  was the arbitration clause and one is the exculpation clause.

24  I'll go into those in detail a little bit later.

25     But they then came back and said, well, wait

1  you're not a unitary interest.  You're each separate and you

2  didn't sign the contract.  So they, at one hand, want to say

3  that they pled the cause of action for breach of duty because

4  there's some duty owed by these various Funds.  And then when

5  we say, okay.  You say we're a unitary enterprise.  Let's

6  look at the contract you signed, they then come back and say,

7  no, wait a second.  You're not a unitary enterprise.  You're

8  each separate.

9       If that's the case, then there's no basis to

10 allege that each one of these Defendants owes a fiduciary

11 duty to these Plaintiffs and this general partner.  The

12 general partnership had two managing members: Mr. Canelas and

13 Mr. Schepis.  And they allege that based on their unitary

14 enterprise theory that somehow all of the Defendants owed a

15 fiduciary duty.

16      And in briefing on the fiduciary duties, we point

17 out that that's incorrect under the exculpation clause.  If

18 you then accept their argument that they're really not a

19 unitary enterprise, there's no basis under Delaware law or

20 Federal law to plead that the Cayman Master Fund owed a

21 fiduciary duty to this Debtor.

22           THE COURT:  Okay.

23           MR. MARTIN:  So from that set of facts going into

24 the arbitration clause, obviously, we rely on the arbitration

25 clause in the partnership agreement.  And because there was

1  unitary enterprise, we attached both partnership agreements.

2  But maybe for purposes of argument, I'll focus on the Capital

3  Fund one because that's the one that they have actually

4  executed.  And that's in the record at Exhibit A to Mr.

5  Brogan's affidavit.

6          And in Section 1304 is where we find the

7  arbitration clause, which reads,

8          "Any controversy between the Partnership and any

9          partner or between any party hereto arising out of

10         or relating to this argument or the breach thereof

11         shall be settled exclusively by the arbitration in

12         accordance with the rules and effect by the AAA."

13         And we, obviously, cite to both the Hayes and the

14  Mentz Corp. (sp) decisions where the Third Circuit has said

15  these types of clauses should be viewed favorably and read

16  broadly, especially when they use terms like arising out of

17  or related to and, indeed, any controversy.  We read that

18  very broadly and urge the Court to do so as well.

19         And then their argument is that none of the

20  parties signed this agreement.  Obviously, between any party

21  here to the Debtor was a party to this agreement.  And to the

22  extent that they're alleging that there's a unitary

23  enterprise in which all of these entities are essentially the

24  same, then under their theory as pled then all of the

25  Defendants should be construed as being parties to this

1  dispute.

2       And if you actually look at what their dispute is,

3  it's should $645,000.00 dollars been paid as a fee.  And was

4  that properly earned.  And then when the management company

5  sent those on to its members, was that appropriate or not.

6  And then they argue that the transfer of the partnership

7  interest was inappropriate.  And this document governs the

8  ability of this Debtor to have put in place a replacement

9  partner and I'd like to direct the Court to two paragraphs

10 that would be relevant in deciding that dispute.

11      The first one is Section 2.05, which provides --

12 I'll wait for you to get there.

13      THE COURT:  Thank you.  Okay.

14      MR. MARTIN:  Which provides that,

15           "The general partner," that's the Debtor, "has the

16           sole and exclusive right to admit to the

17           partnership one or more additional general

18           partners if such new general partner or general

19           partners or entities that are controlled by or

20           primarily owned by Anthony Schepis or Frank

21           Canelas."

22      The complaint alleges that Northeast is owned by

23 Mr. Schepis and Mr. Canelas.

24      It then if you turn to Section -- actually it's

25 Article 8.  Section 8.4 provides that the general partner may

1  also appoint an additional general partner or a replacement

2  general partner without the consent of the limited partners.

3          Now in fairness to the Court, they would point to

4  Section 8.1 and argue that there's perhaps some confusion or

5  ambiguity over the rights to provide that replacement

6  partner.  Unless Your Honor wants to hear the substantive

7  arguments on that, I won't make them.  I just do want to note

8  for the Court that they would counter my 8.4 argument with an

9  argument under 8.01, which prohibits the transfer of an

10 interest or voluntarily withdrawal from the partnership

11 without majority holder consent.

12         Obviously, my client believes that Section 8.04

13 and 2.05 govern.  They believe that 8.01 prohibits it.  But

14 the dispute is to be decided on the terms of this contract by

15 parties to it and, therefore, any controversy within the

16 language of the arbitration clause.  And we, therefore,

17 submit that it must go to arbitration.

18         And while I normally hesitate to tell the Court

19 that the Court doesn't have discretion or that the Court must

20 do something, I think if you read the Third Circuit cases,

21 there's some pretty strong language about the intent of

22 Congress when it passed the Federal Arbitration Act.  And

23 there's even cases dealing with I think Judge Gross has a

24 decision that we cited in our briefing.  And the Third

25 Circuit has some cases where they say when the dispute falls

1    within the language of an arbitration clause, the Bankruptcy

2    Courts don't have the discretion to not send the case to

3    arbitration.

4              THE COURT:  Would that be true for Counts 1, 2 and

5    3, which are fraudulent conveyance counts and estate causes

6    of action?

7              MR. MARTIN:  Two points there.

8              The first point is a factual one which is we

9    construe those disputes as dealing with whether the

10   $645,000.00 dollars was a properly earned fee that could be

11   distributed by the general partner.  And so believe that that

12   dispute would be governed by this agreement and, therefore,

13   subject to arbitration.

14             To the extent that the Court disagrees and finds

15   that it's an estate cause of action, we did cite in our

16   brief, I think some cases from this Court, not Your Honor,

17   but other Judges in this District, that stayed those non-

18   estate causes of action.  And, specifically, the EXDS case I

19   think it was that Judge Walsh wrote where he stayed the

20   causes of action that might be estate causes of action on a

21   finding that the termination of arbitration might aid in a

22   resolution of or in the Court's future litigation of those

23   causes of action.

24             And so, obviously, in light of the fact that

25   there's a similar lawsuit in the Southern District of New

1   York where there have been similar challenges made to the

2   conduct by the same parties --

3            THE COURT:  No and that's where I disagree with

4   you.  These causes of action here are the Debtors' causes of

5   action.  They're not or are they?  Where are you saying that

6   they are the Claridge party cause of action, et cetera?

7            MR. MARTIN:  Yeah, so that's a fine question, and

8   I understand that they say that they're standing in the shoes

9   of the Debtor.  Obviously, you know, I fought against that a

10  lot in the past.  But, just where we are right now, I'll walk

11  the Court through how I get there.

12           So this Debtor was a party to the arbitration.

13  And what Judge Failla says, specifically in footnote 8 on

14  paragraph 23 is, is that there's an issue of whether the

15  action against -- she specifically here referring to whether

16  Mr. Schepis and Mr. Canelas should have been added to the

17  arbitration as parties accused of reaching a fiduciary duty

18  is something that should be arbitrating.

19           And she's sending this dispute, which asserts

20  breaches of fiduciary duty by the Claridge parties against

21  Mr. Schepis and Mr. Canelas to the arbitrator that decided

22  the original dispute over the Debtor.

23           THE COURT:  But she's sending it to and decide the

24  *race judicata* effect of his ruling, right?

25           MR. MARTIN:  With respect to the -- yes, with

1  respect to the breach of fiduciary actions which are asserted

2  in this complaint on behalf of Pursuit Capital Management,

3  which was the Defendant in that arbitration.

4        THE COURT:  She doesn't really interpret.  I read

5  this a couple of times and she doesn't really interpret who

6  the parties to the agreement are, does she?

7        MR. MARTIN:  To the --

8        THE COURT:  She just says -- to the arbitration

9  agreement.  Where does she do that?

10        MR. MARTIN:  So the way I read it, Your Honor, and

11  over on page 14, she culminates in -- she performs what the

12  Delaware State lawyers, we know there's Chancery guys are all

13  a lot smarter than us bankruptcy guys, but they have what

14  they call the Dooley test.  And they look at who's going to

15  benefit from an action that's going to be brought.  And they

16  look at whether it's going to be the, you know, the company

17  or the individual creditor.

18         And essentially what she -- the way I read this

19  is that this distinction at this point in time with respect

20  to these legal entities is largely illusory is what she says

21  on page 13.  And I submit that that's applicable here.

22  There's no dispute.  And, in fact, it's pled in the complaint

23  that in their mind the only proper creditor is them.

24         So to suggest that they're doing this for the --

25  you know, this is not a case where there's thousands of

1   creditors and someone has purchased an action and is

2   prosecuting it for "the benefit of the estate and a bunch of

3   creditors."  They purchased this action, in our mind, to have

4   a different legal theory on which to assert claims that

5   they've asserted in four or five different jurisdictions and

6   to multiple the floor in which that litigation is occurring.

7           We now have an arbitration action, a Southern

8   District of New York action.  We have Connection litigation,

9   and we have this litigation.  And we have four tribunals

10  presiding over the same set of facts, seeking recovery of the

11  same amounts of money.

12          THE COURT:  Well isn't that because the Defendants

13  haven't paid them for the judgments that have been entered so

14  far?  Isn't that the reason we still have litigation here?

15  Because there have been judgments entered and I'm assuming

16  they've gone unpaid.

17          MR. MARTIN:  That's not in dispute.  I'm not going

18  to argue with Your Honor on that.

19          THE COURT:  Okay.  So how can the Defendants

20  complain about serial litigation when they haven't paid the

21  judgments against them, which could end the serial

22  litigation?

23          MR. MARTIN:  Because why do we need four

24  jurisdictions when we can have one?

25          THE COURT:  I don't know.  Why aren't the

1  Defendants paying their judgments?

2            MR. MARTIN:  Because, in their mind, they're not

3  legally obligated to for substantive reasons, which is that

4  as a result of the arbitration, they violated the side pocket

5  agreement and were ejected from the interest in those assets

6  and lost their right to collect in that.  That's the issue

7  between the Pursuit parties on one hand and the Claridge

8  parties on the other hand.

9            That's being litigated in two different forums at

10 least.  They then come into this Bankruptcy Court and by a

11 cause of action so that they can then say on the same set of

12 facts, you should have to pay us also.  And then they say in

13 their complaint well we're only seeking one recovery, so, you

14 know, don't worry if we ultimately get it in Connecticut or

15 New York, I guess we'll dismiss this action.

16            But I don't know why we should be here litigating

17 the same set of facts on the same legal theories.  It's not

18 to say that they couldn't have asserted, you know.  I know

19 that the arguments that I have made in the past about their

20 right and their standing to bring actions on behalf of the

21 Trustee have not met with success, and I can go into that in

22 a little bit because of Judge Andrews' decision.  But they

23 could stand in the shoes of the Debtor in Connecticut or in

24 New York.  They did not have to -- they do not have to bring

25 the adversary here.

1          And so part of what we're trying to do is stop the

2    duplication of litigation.  We're not saying dismiss this

3    action and tell them they can't assert these rights in

4    Connecticut or New York.  We're saying send this to

5    arbitration.  That's our primary argument that this is --

6          THE COURT:  There's going to be a different

7    arbitration?

8          MR. MARTIN:  That will be for the American

9    Arbitration Association to determine.

10          THE COURT:  So how does that cut down on

11    litigation if it's going to be a different arbitration?

12          MR. MARTIN:  I'm not saying that it will be a

13    different arbitration.  I'm not at an AAA arbitration lawyer

14    so I'm not trying to represent to the Court.  So I'm not

15    trying to represent to the Court that it would be the same or

16    it would be different.

17          I'm saying that that will be for that tribunal to

18    sort out.  I would hope that they would consolidate any

19    arbitration that Your Honor sends to arbitration with the one

20    that Judge Failla sends.  It's the same facts.  It's the same

21    issues.  And, in fact, Your Honor, if you look at the Phase

22    II judgment that's attached to the complaint.  It says on

23    page 3 of Exhibit B.

24          THE COURT:  Yes, I'm there.

25          MR. MARTIN:  The tribunal continues -- I'm reading

1  at the end of the last sentence at the end of the first full

2  paragraph.

3              "Accordingly, the tribunal continues to retain

4              jurisdiction with respect to said potential issues

5              as to reserves and the USB litigation.  Such

6              matters are not subject of or in any way addressed

7              or decided in this Phase II decision."

8          As part of this arbitration, they were seeking a

9  determination that they had a direct interest in the UBS

10 litigation, that as Limited Partners they were entitled to

11 the proceeds.  They sought to intervene in the UBS litigation

12 and that was denied.  They took many, many actions -- and as

13 I stated earlier, at this point in time the UBS litigation

14 had been dismissed.

15         And this Judge is saying I don't have to decide

16 that right now.  But he did retain jurisdiction.

17         THE COURT:  So is there currently an arbitration

18 pending in the -- somewhere?

19         MR. MARTIN:  As I understand it, as a result of

20 Judge Failla's decision there's been some letters sent to the

21 arbitration panel about what happens next.  I'm not counsel

22 on that matter, so --

23         THE COURT:  But aside from that, is there when

24 you're saying pointing to this saying that an arbitrator

25 retains jurisdiction, is there actually some current, aside

1  from Judge Failla's referral, some arbitration that still is

2  being litigated, as being arbitrated?

3          MR. MARTIN:  My suspicion is that the answer to

4  that is no because they got these judgments recognized under

5  New York law.  But as I understand it, it's because Judge

6  Failla has said the issue of *race judicata* for Mr. Canelas

7  and Mr. Schepis has to go back to this arbitration panel that

8  there's going to be -- I mean I guess we would characterize

9  it as reopening a bankruptcy case, for example.  That there

10 would be an effort to go to the arbitration panel and say

11 that Judge Failla sent us here.  Whether it will be the same

12 arbitrary under the same caption, I can't represent that to

13 the Court.

14         THE COURT:  Have the New York, I guess it would be

15 Supreme Court orders that affirmed the arbitration judgments,

16 have they been appealed?  Are they on appeal?

17         MR. MARTIN:  I don't recall the answer to that off

18 the top of my head.  To the extent that they were appealed, I

19 don't believe that any appeals are still pending.  And that

20 everybody used them as final judgments.

21         THE COURT:  Okay.  So those two judgments in

22 arbitration that were affirmed by the Supreme Court, they are

23 final as far as you know?

24         MR. MARTIN:  As far as I stand here today, yes.

25         THE COURT:  Okay.

1            MR. MARTIN:  So, in our mind --

2            THE COURT:  Wait, let me ask again.

3            So, currently, there's the Connecticut litigation

4  --

5            MR. MARTIN:  Yes.

6            THE COURT:  Which there's just been a ruling on,

7  is there any --

8            MR. MARTIN:  And it's important that that's in the

9  Alpha Beta case so it's a ruling that relates to the

10 interpretation of the same contract, but with respect to

11 different former general limited partners.

12           THE COURT:  Okay.  I'm just trying to get a handle

13 on all the litigation that's out there currently and active;

14 active litigation.

15           So we have the case in Connecticut.

16           MR. MARTIN:  Yes.

17           THE COURT:  Where we just had a ruling.

18           MR. MARTIN:  That's Alpha Beta.

19           THE COURT:  Alpha Beta.  And is there -- has there

20 been an appeal of that?

21           MR. MARTIN:  I don't know the answer to that

22 question.

23           THE COURT:  Okay.  Is there -- was there anything

24 remaining in that litigation or did the Judge rule on

25 everything in that litigation?

1          MR. MARTIN:  I believe that this decision deals

2 with everything, but there may be post-judgment issues as is

3 usual in a. . .  This judgment was at the conclusion of a

4 trial.  I think they had a month long trial in that case,

5 Your Honor.

6          THE COURT:  Okay.  So the Alpha Beta, we just had

7 the Judge and his ruling and there may be post-trial stuff.

8          We have the case before Judge Failla.

9          MR. MARTIN:  Yes.  That's the Southern District of

10 New York action.

11          THE COURT:  And what other active litigation do we

12 have between any parties?

13          MR. MARTIN:  There's -- it's a long list

14 historically.  I'm trying to figure out which ones are

15 active, so just give me a moment, Your Honor.

16          So there's an action in Connecticut that Claridge

17 has brought against Pursuit that relates to an injunction

18 proceedings that were filed by Claridge.

19          And that may be -- is that the one -- that's the

20 one we also attached to Mr. Brogan's affidavit.  We attached

21 that Connecticut action.

22          And then there's some other litigation captioned

23 as different matters between Alpha Beta and various of the

24 Pursuit Entities that these involve what's called a

25 provisional judicial remedy, which is a Connecticut

1  procedural mechanism that relates to the staying of assets.

2              As noted in the Genuario decision, the UBS

3  litigation has settled, so that's no longer pending.

4              There's this case.  And there was at one point in

5  time a case down in Florida involving the estate of Mr.

6  Schneider, but I think that has been dismissed on appeal.

7              There's a couple of other actions that have been

8  withdrawn, but I think the ones that I've just mentioned are

9  the main ones.

10             THE COURT:  Thank you.

11             MR. MARTIN:  Okay.  So, Your Honor, again, so, you

12  know, I think the standards for assigning to arbitration, the

13  contract provision, I don't think if you look at the

14  briefing, there's a big dispute over what the standards that

15  this Court applies.  I think we're citing the same cases.

16  The contract provision, I think, there's an acknowledgment

17  that it applies.  They simply make the argument that certain

18  of the Defendants aren't parties to that agreement.

19             THE COURT:  So does it depend on the unitary

20  enterprise allegations in the complaint?  Does your argument

21  depend on that to bring all the parties into the arbitration?

22             MR. MARTIN:  I don't believe that it does because

23  if you accept their argument that they're suing on behalf of

24  the general partner who is a party to that agreement and who

25  is raising disputes that are governed by that agreement

1   involving parties to it that it should go to arbitration.

2          THE COURT:  Well aren't the only parties or my

3   question is -- are the only parties to the agreement the

4   Debtor as a general partner and any limited partners that

5   actually signed the agreement?

6          MR. MARTIN:  And the limited partner itself, the

7   Pursuit Capital -- one of the Defendants, Pursuit Capital --

8          THE COURT:  The partnership.  The partner --

9          MR. MARTIN:  The partnership itself.

10          THE COURT:  The partnership itself.

11          MR. MARTIN:  Yes.

12          THE COURT:  Okay.

13          MR. MARTIN:  But I don't dispute that Pursuit

14   Capital Partners (Cayman) Limited, for example, has not

15   signed this partnership.  It has its own partnership

16   agreement.  Pursuit Opportunity Fund has its own partnership

17   agreement, and those have arbitration clauses in them as

18   well.  We attached the Pursuit Opportunity Fund I for the

19   Court's benefit, but that's not the one that I believe is

20   relevant.

21          THE COURT:  Okay.  And but is it clear that all of

22   the Defendants -- are any of the Defendants -- I'll just ask.

23          Are any of the Defendants limited partners who

24   signed this agreement?

25          MR. MARTIN:  The only reason I'm pausing is

1  because I'm just not certain about Mr. Schepis and Mr.

2  Canelas, whether they individually signed it or whether

3  they've done it through some other investment device.

4            THE COURT:  Okay.  So it's possible that Mr.

5  Schepis and Mr. Canelas are limited partners who may have

6  signed this particular partnership agreement.

7            MR. MARTIN:  Yes.

8            THE COURT:  Other than them, I kind of assumed,

9  but I wanted to ask that none of the, I'll call them

10 corporate entities, none of the non-individuals --

11            MR. MARTIN:  Well Northeast Capital Management,

12 LLC as the replacement general partner, I pointed out that

13 Section at 2.05 to the extent that they became the

14 replacement general partner, they're obligated to perform

15 under the limited partnership agreement, so I would say that

16 they're a party as well.

17            THE COURT:  Okay.

18            MR. MARTIN:  Now if -- and I'm not trying to be

19 coy about it if the theory is only that people sign it go to

20 arbitration, I think that then undermines their allegations

21 that these other parties should even be Defendants here.  And

22 I would submit they should be dismissed out.

23            THE COURT:  Well, it might undermine some theory,

24 at least.  But I just wanted to make sure I understood on a

25 factual basis your argument, and I understand it to be

1  dependent upon the allegations that have been made in the

2  complaint that we have a unitary enterprise.

3            MR. MARTIN:  Right.  And so we filed a motion to

4  dismiss with unitary enterprise peppered throughout.  And

5  then we're met with an argument of well you have to be a

6  signatory.  So, in my mind, it kind of confused the

7  opposition raised an issue that we had not contemplated.

8            So I think, unless Your Honor has any further

9  questions on arbitration, I'll move on to some of the other

10 issues that we've briefed on.

11           THE COURT:  Thank you.

12           MR. MARTIN:  I think, Your Honor, we've touched

13 already on the personal jurisdiction.  I think the briefing

14 addresses specifically the Cayman Island entities.  Unless

15 Your Honor has questions on that.

16           Obviously, we've alleged that kind of what I just

17 said, which is that these Cayman Funds are formed in a

18 foreign jurisdiction and there are not allegations in here as

19 to what those Cayman Funds did that would have exposed them

20 to the jurisdiction of this Court.  In reply, the Plaintiffs

21 allege that they received some funds somehow, but that's not

22 alleged in the complaint.  And they argue that because

23 they're Plaintiff in some other actions in Connecticut that

24 that somehow makes them subject to the general jurisdiction

25 to the Court.

1       We cited in our briefing case law that disputes

2  that point.  So I think that issue is kind of squarely

3  briefed and before the Court.  And unless -- I don't want to

4  belabor that point unless Your Honor has further questions on

5  it.

6       THE COURT:  Well, I do have questions, but I think

7  they probably go to the Plaintiffs more.

8       MR. MARTIN:  Okay.

9       Your Honor, we also talk about standing and our

10  standing argument we essentially have made two arguments.  I

11  know Your Honor is probably familiar with the first one,

12  which is that we have submitted that as a matter of

13  bankruptcy law, these parties could not have acquired the

14  right of the Trustee to prosecute the action in the shoes of

15  the Trustee.

16       I know we appealed that and Judge Andrews said we

17  now have to come back down here and make the arguments that

18  we made in front of him to Your Honor.  And, obviously, the

19  way we briefed it, we had essentially asked for you to let us

20  go make the arguments to Judge Andrews.  We ask that you stay

21  the whole action, which you did in a limited way.

22       We went and made our arguments to Judge Andrews

23  and now he said well actually this is a decision for this

24  Court.  So I'm happy to kind of flesh out my substantive

25  standing point on the grounds of Cybergenics in a case in the

1  Northern District of Texas called In re Cooper.

2        THE COURT:  Well, I was looking for that briefing,

3  and I didn't have that briefing.  So it leaves me in a

4  position of not being prepared to hear that argument.

5        MR. MARTIN:  And I was worried about that, which

6  is why we attached the Judge Andrews' decision.  And to the

7  extent that Your Honor wants either -- we briefed this in

8  front of Judge Andrews.  We could get you the briefs and the

9  transcript and let Your Honor decide over it.  Or we could

10 resubmit if you're going to want briefing on the other

11 issues, we could also address this issue as well.

12        I'm a little hesitant to dive into case law that

13 wasn't in our briefs because of the way we briefed it.  But

14 in light of Judge Andrews' decision which came down just, you

15 know, within the last three or four weeks, I'm at a little

16 bit of the pleasure of the Court on that issue.

17        THE COURT:  Well, I'm not prepared to hear that

18 argument today.  So I think it's going to have to be

19 separately briefed with Plaintiffs having an opportunity to

20 respond and I'll have to decide whether I need argument on it

21 or not once I've seen the briefing.

22        MR. MARTIN:  Okay.  And we can work with them on

23 whether we just do that as a supplement to this or would Your

24 Honor like a separate motion on just that point?

25        THE COURT:  Well, I have -- I didn't want to start

1  teeing up and I'm not even sure what the rules are on how

2  many motions you get.

3       MR. MARTIN:  I think our preference would

4  certainly be supplemental briefing because of the way

5  procedurally we got in front of the Court on this issue by

6  going up to the District Court and coming back down.  And him

7  saying that he's going to defer to this Court to make that

8  initial decision.

9       THE COURT:  I know.  His decision seemed to

10  suggest that it had been briefed here, though, and it really

11  hadn't.

12       MR. MARTIN:  Well we told Judge Andrews that we

13  had filed a motion to dismiss and that we had made the

14  argument to him, but that we did have a pending motion to

15  dismiss.  We did not go into all the details about what that

16  motion to dismiss raised.  And that he ruled the way he did.

17  And, like I said, I'm happy to give you the transcript if

18  that helps Your Honor decide on how you want to deal with it.

19       THE COURT:  Well, I'll hear whether the Plaintiffs

20  have any thoughts with respect to whether and how it gets

21  raised.

22       MR. MARTIN:  Okay.  So let me then move to the

23  second point, which I think is more squarely before the

24  Court, which is the point that we made in our brief that

25  standing is a jurisdictional matter that needs to be

1  adequately pled.  And that in this case Your Honor entered an

2  order that governed which actions could be prosecuted.

3  That's the order that was entered at docket number 190 that

4  approved the agreement to sell and assign these causes of

5  action.

6         And that in that there were two claims defined,

7  the insider avoidance action, which is the $645,000.00 dollar

8  issue that we talked about, and the UBS claim, which was

9  defined as, in essence, the claims related to the Debtors'

10 services general partner including distributions or

11 allegations made.  This is on page 3 of the actual agreement

12 that was attached to the order.

13        And so we submit other than the actions related to

14 those, the Plaintiffs did not acquire the right to prosecute

15 them.  And the order set forth the procedure by which they

16 could prosecute them potentially.  And that procedure was

17 that they had to give notice to the Trustee and the Trustee

18 either had to consent or object, in which case they would

19 then have to come to this Court and satisfy the requirements

20 of the second Cybergenics case that requires showing a

21 colorable claim and the other standards there.

22        So we noted in our motion to dismiss that they had

23 not pled that they had done that and that, therefore, they

24 didn't have standing for a number of the causes of action.

25 In their opposition to that, they responded by providing a

1  declaration that we separately have moved to strike, the

2  limited paragraph, paragraph 3 of Ms. Reilly's declaration

3  that that states that they did send it to the Trustee before

4  they filed it.

5          We, obviously, don't think that should be

6  considered for the reasons we stated in our briefing, which

7  are pretty straightforward.  It's a motion to dismiss.  And

8  Your Honor relies on the four corners of the complaint, not

9  declarations submitted in response to briefs to dismiss.

10         THE COURT:  Well, I think that's pretty clear on a

11  (b)(6) motion, but this is a (b)(1) motion, so doesn't that

12  make a difference.  They, at least, cited a Third Circuit

13  case that seems to suggest that does make a difference.

14         MR. MARTIN:  Your Honor, we think that in these

15  circumstances it does not make a difference and that, but if

16  the Court disagrees we think that if you don't strike that

17  provision of the declaration it still doesn't meet the

18  requirements of the order.  There's not an email or a letter

19  to Mr. Felger attached.  There's no response back where he

20  can sense.  There's no response back where he doesn't

21  consent.  We don't really know what happened.

22         THE COURT:  Yeah, but who's benefit was that for?

23  Wasn't that for Mr. Felger's benefit, not for the benefit of

24  the Defendants?

25         MR. MARTIN:  Well, I would submit that in light of

1  Mr. Felger's position that in Docket Index Number 37 which

2  deals with his statement about not wanting to be the general

3  partner.  And with respect to the finding -- with respect to

4  the provisions in the agreement that specifically state that

5  Mr. Felger and Mr. Burtch -- I should say Mr. Burtch, not Mr.

6  Felger because he's counsel, so it's Mr. Burtch doesn't want

7  any actions that would essentially put the Debtor back into

8  place as a general partner.

9          That while it was done for his benefit, obviously,

10 the color-ability of a claim is something that we would

11 normally have the right to be heard on.  And the standard for

12 a particular claim is a motion to dismiss standard.  So I

13 appreciate the Court's view of us raising a kind of

14 procedural issue that maybe is one that could be solved

15 relatively straightforward.

16          I have to raise it because pleading rules require

17 that standing is pled.  And there's an order that set forth

18 that this Court set forth the requirement for obtaining

19 standing on several of the causes of action asserted, and

20 there's no pleading that they complied with that order.

21          THE COURT:  Okay.  So if the complaint had said

22 that they provided three days' notice to the Trustee and he

23 did not object, would that satisfy that requirement, that

24 pleading requirement?

25          MR. MARTIN:   For purposes of the motion to

1  dismiss, yeah.  I mean we would have the right to explore

2  that on discovery.

3            THE COURT:  Okay.

4            MR. MARTIN:  So I think that covers the

5  jurisdictional and standing issues.

6            The last issue that I really want to end with is

7  the exculpation issue because I think that's an important

8  issue to kind of focus the Court on.

9            THE COURT:  I'm sorry; I wasn't focused there for

10  a moment.  What are we turning to?

11            MR. MARTIN:  I was going to cover the, they state

12  of claim on the fraudulent transfer causes of action, which

13  require reference to the exculpation provision and the

14  limited partnership agreement.  So I wanted to go back to the

15  terms of the limited partnership agreement, Article 12.

16            And Article 12.01 provides that the general

17  partner, which is the Debtor, or its respective officers,

18  partners, shareholders, directors, members, managers, agents

19  so that's Mr. Schepis and Mr. Canelas.  That's probably a

20  broker dealer, that's probably the investment manager,

21  agents, employees, and affiliates, capital A, which is itself

22  independently defined in the agreement.

23            Back on page 2 and Article 1.01(b).  And I won't

24  belabor the definition by reading it into the record, but we

25  would contend that essentially each of the Defendants is

1  covered as an Affiliate because of the way the Fund is

2  structured.  And that, therefore, when it says general

3  partner and respective officers... all the way through to

4  Affiliates, you can read,

5           "The Defendants in this action shall not be

6            personally liable to the partnership or the

7            limited partners for any applicable commission or

8            omission except that they engage in fraud, willful

9            misconduct, or gross negligence."

10          I did a search of the complaint electronically for

11 the words fraud, willful misconduct and gross negligence and

12 the place where fraud comes up is in asserting fraudulent

13 transfer causes of action.  So all of the breach of duty

14 claims and the other claims do not seek recovery for fraud,

15 willful misconduct or gross negligence under the standards of

16 Delaware corporate law.

17          They assert breach of duty of loyalty.  And we

18 cite to the provision of the limited partnership agreement

19 171101, which says that partnership agreements can, in fact,

20 eliminate fiduciary duties.

21          THE COURT:  Well, they can, but don't they usually

22 say?  They'd not done through an exculpation provision.

23 They're done through a provision that says we are limited our

24 fiduciary duties pursuant to Section 17 blah (1) and we don't

25 have any.  And they spell it all out.  Is that in the

1 | partnership agreement?

2 |         MR. MARTIN:  Yes at Section 3.11.  And this talks

3 | about the general partner.

4 |         THE COURT:  Right.

5 |         MR. MARTIN:  Not having liability.  So that would

6 | be Northeast and this Defendant for also, again, fraud,

7 | willful misconduct or gross negligence.

8 |         THE COURT:  Okay.  So that's another question

9 | that I have.

10 |         MR. MARTIN:  So from the standpoint of the general

11 | partner Northeast acting to "take the carried interest"

12 | Northeast can't be liable for that.  The way this complaint

13 | is pled.

14 |         To the extent that they want to then extend

15 | liability for that conduct to other members within the

16 | affiliated group then the limited partnership, Pursuit

17 | Capital I, has to indemnify them to the extent that they

18 | prevail.

19 |         THE COURT:  Okay.  That's a different question.

20 | So okay, so now we have a provision 3.11, which I haven't

21 | looked at so I'll have to take a look at that.

22 |         MR. MARTIN:  And then, Your Honor, just out of

23 | fairness to you and I know that they may present it in

24 | Section 3.12 there is a sentence that says, subject to the

25 | general fiduciary responsibilities of the general partner to

1   the limited partners imposed by this agreement.  I think they

2   may argue that that somehow builds in all fiduciary duties,

3   but we argue that -- we would argue in response to that that

4   imposed by this agreement is in a reference back to Section

5   3.11 because that's the provision that addresses on what

6   basis the general partner could have liability.  And its

7   fraud -- it's the three standard stated there.

8           THE COURT:  Okay.

9           MR. MARTIN:  I didn't want to just want to mention

10  3.1 and ignore 3.12 because I know Your Honor would want to

11  look at the full document.

12          THE COURT:  I appreciate that.

13          Going back to the exculpation provision, it talks

14  about the general partner and all of these parties not being

15  liable to the partnership.  The partnership here being

16  Pursuit Capital Management Fund I, L.P.

17          MR. MARTIN:  Yes.

18          THE COURT:  So as one would expect the general

19  partner there is the one who's seeking to be exculpated; the

20  general partner being the Debtor.

21          So if the partnership sued the Debtor, the Debtor

22  is exculpated.  Okay.  That's sort of the reverse of what we

23  have here where the Debtor is suing the partnership then a

24  whole bunch of other entities.

25          Am I misreading the exculpation provision because

1  I'm not reading it as relevant to a situation where the

2  general partner is suing the partnership, but the reverse

3  where the partnership is suing the general partner?

4         MR. MARTIN:  Well I think really what you're

5  saying is the former general partner is suing the present

6  general partner and all of the affiliates for conduct that

7  the present general partner participated in with those other

8  entities.

9         THE COURT:  Well that's kind of even more

10 interesting.

11        MR. MARTIN:  And so to the extent that and we

12 allege that what the complaint essentially does is it sets

13 forth an action on behalf of the general partner in its

14 capacity as general partner of this partnership against the

15 now general partner and its affiliates for the carried

16 interest that's payable under this partnership agreement and

17 for the recovery of fees that were paid under this

18 partnership agreement.

19        THE COURT:  Okay.  Even assuming that, how does

20 that fall within the exculpation provision?  I'm not

21 understanding the reading of it where this -- as I'm reading

22 it, it's when the partnership sues the general partner, not

23 when the former general partner sues the current general

24 partner or where the current general partner sues the

25 partnership, but where the partnership sues the general

1 partner.

2         MR. MARTIN:  Well, I think if you look at then

3 Section 12.02.

4         THE COURT:  The partnership is going to indemnify,

5 but that's a different issue.

6         MR. MARTIN:  Yeah, but the point is, is that we're

7 going to --

8         THE COURT:  The partnership -- again, the

9 partnership if it sued the general partner, isn't that the

10 situation?  How am I misreading that?

11         MR. MARTIN:  Well, Your Honor, I submit and

12 certainly it sounds like perhaps you disagree with me that

13 the exculpation clause covers affiliates of the general

14 partner.  I read this to say for disputes under this

15 partnership agreement.

16         THE COURT:  But where it says shall not be

17 personally liable to the partnership.

18         MR. MARTIN:  Yes.

19         THE COURT:   Okay.  So the general partner and all

20 of its affiliates shall not be liable to the partnership or

21 limited partners for any act.  That's what's being

22 exculpated.  How does it -- I'm asking because I'm not

23 reading it your way and I want to understand why I'm wrong.

24         MR. MARTIN:  And you have to appreciate that

25 perhaps we're not drawing as a final line.  We view this

1 | action to be essentially one asserted on behalf of this
2 | limited partnership.  The people that are asserting these
3 | actions against these Defendants are the former limited
4 | partners who acquired the "acquired" the claims of the
5 | general partner to be able to prosecute and recover funds
6 | that they believe they should have been paid under this.

7 | So while the technical forum may not fit squarely
8 | within this, we submit that substantively what the Plaintiff
9 | is doing here is seeking to hold the affiliates liable to the
10 | limited partners of the partnership for their actions.  And
11 | we submit that that falls within this exculpation provision.

12 | THE COURT:  Okay.  So I shouldn't read it
13 | literally.  I should read it contextually?

14 | MR. MARTIN:  I'm urging the Court to read it in
15 | light of the manner in which the complaint has been pled
16 | because we're here on a motion to dismiss.

17 | And if you look at the way they pled in the
18 | complaint, they're essentially saying that the carried
19 | interest that should have been paid to the general partner
20 | here should be paid back to the general partner so that it
21 | can be paid to the limited partners who have a judgment
22 | against that general partner.

23 | In my mind that's the same thing as the limited
24 | partner suing these parties for conduct under this
25 | partnership agreement.  It has a technical forum that's

1  slightly different but, in substance, it's the same thing.

2          It's worth the argument that in the Judge

3  Genuario decision, Alpha Beta who's here through assignment

4  to these parties, as alleged in paragraph 8, argue that there

5  shouldn't even be a carried interest to be paid.

6          THE COURT:  Okay.  Are you saying that -- what if

7  the Trustee had brought this cause of action, okay, as the

8  Trustee of the Debtor.

9          MR. MARTIN:  Yes.

10         THE COURT:  The general partner.

11         MR. MARTIN:  Yes.

12         THE COURT:  Are you saying in that instance the

13 exculpation clause would not apply to him?

14         MR. MARTIN:  I would have to look at what he pled.

15 I have a feeling that if the Trustee in this case has brought

16 an action, it would have been counts 1 through 3 for the

17 $645,000.00 dollars.  In light of his statement at docket

18 entry number 37, I don't think he would have brought these

19 other claims and causes of action.

20         He says in that statement that he used the

21 quote/unquote, and I can hand it up if Your Honor would like

22 to look at it.

23         THE COURT:  I have it.  I have it -- hold on.  I

24 got it.

25         MR. MARTIN:  The point of the statement is and I

1  take a lot from the last paragraph 11 the Debtors is no

2  longer the general partner, has no ability to direct the

3  funds of the partnership, does not seek to be restored, and

4  the Movant's remedy should be against the partnership or the

5  current general partner of the partnership.

6          He earlier says that, you know, part of what's

7  driving in here is that he used this to be an acrimonious

8  dispute between the former Fund managers and the limited

9  partners, and he wants to get out of the way.

10          THE COURT:  Which I think he did.  But he doesn't

11  say here that there's no cause of action.  He says he doesn't

12  want to be the general partner and they're not trying to --

13  the Plaintiffs here are not trying to restore anybody as the

14  general partner.  And he doesn't want to be the general

15  partner.

16          MR. MARTIN:  Right.  I mean we argued in our

17  briefing that if they don't want to be general partner that's

18  another point that goes to our standing argument.

19          But my view is that to try to keep it simple that

20  this exculpation clause covers the relief sought in this

21  complaint as pled.  That essentially the general partner is

22  acting on behalf of the Capital Fund Partnership to collect

23  proceeds based on conduct alleged under this partnership

24  agreement that should be paid to limited partners.

25          And that the forum in which they have done it

1   implicates this provision.  And that if not been then they've

2   essentially end run around this provision and having agreed

3   that these parties wouldn't have liability through the

4   partnership, they've eviscerated this through a purchase of a

5   cause of action in a bankruptcy case.  And I don't think

6   that's the purpose of the -- and this is, you know, this is

7   my argument on why the policy should not have permitted this

8   transfer in the first place.

9          But with respect to just the clause, I'm making a

10  substance argument more than a form argument.  And that would

11  be my response to Your Honor's questions about the substance

12  does the substance of the form of the agreement technically

13  apply to this situation because I certainly understand how

14  Your Honor's reading it.

15         THE COURT:  Okay.

16         MR. MARTIN:  And one final point on that, Your

17  Honor, is that if you look at -- if you look at Section 4.08

18  on page 13 of the limited partnership agreement, this

19  provision says that the general partner shall not be

20  personally liable for the return or repayment of all or any

21  portion of the capital or profits of any limited partner.  It

22  being expressly agreed that any such return shall be made

23  solely from the assets of the partnership without any right

24  of contribution from the general partner.

25         That provision is important is because to the

1  extent that Northeast were to ever become entitled to carried

2  interest, which Judge Genuario's decision said they should

3  not be entitled to, this provision says that they shall not

4  be liable to give it over out of their assets.  It has to

5  come from the assets of the partnership.

6         The reason that's important is because the carried

7  interest actually comes from Section 4.02, which is in the

8  middle of the paragraph on page 11 where the 20 percent

9  interest is created, is it's actually a 20 percent interest

10 of the limited partner share in the Fund that's been given

11 over to the general partner as part of its management fee.

12        So, essentially, seeking to recover the carried

13 interest is seeking to recover a portion of the profits of

14 any limited partner that have been contractual given to the

15 general partner.  So that's an additional reason in addition

16 to the exculpation clause why the contract protects Northeast

17 from any liability, to the extent it gets any carried

18 interest.

19        Now, obviously, I think you probably read the

20 Genuario decision and we believe that, and their complaint is

21 peppered with allegations that this carried interest was

22 improperly taken.  Alpha Beta went up there and argued that

23 there should be no payment of carried interest, but here

24 they're arguing, oh no, there should have been a carried

25 interest, so you have conflicting arguments.

1            But we submit even if somehow we become entitled -

2   - Northeast were to become entitled to a carried interest,

3   this provision would provide that Northeast would not be

4   personally liable for it.  It would have to come out of the

5   partnership assets.

6            And I know Your Honor said indemnification is a

7   different question and this is a similar type argument --

8            THE COURT:  This doesn't get around to fraudulent

9   conveyance or somehow some kind of a -- well either some kind

10  of a fraudulent conveyance or some kind of an improper

11  replacement of Northeast, of the Debtor by Northeast, would

12  it?  I mean it's just the contractual term.

13           MR. MARTIN:  To the extent that their argument is

14  that what they're seeking to recovery through the fraudulent

15  transfer is the carried interest payment, I would submit that

16  it is covered by this provision.

17           THE COURT:  Well, but if it should have gone to

18  the Debtor and Northeast improperly replaced it for the sole

19  purpose of stripping the Debtor of its assets, it wouldn't

20  preclude recovery on that, would it, by this contractual

21  provision?

22           MR. MARTIN:  I'm having a hard time answering that

23  question because the Genuario decision makes a specific point

24  that but for the perseverance and hard work of Northeast and

25  Mr. Schepis and Mr. Canelas, there never would have been any

1  money in the UBS action, and he doesn't mean to minimize

2  that.  So I have a hard time even accepting that there could

3  be a fraudulent -- there's not reasonably equivalent value to

4  the extent they become entitled to --

5          THE COURT:  Yeah, but both of these entities are

6  essentially Schepis and Canelas so they took what they had

7  over here and they put it over there, and they pursued the

8  litigation.

9          MR. MARTIN:  I mean our position is that that was

10  proper and that this provision would cover it if the Court

11  determined it would not.  But if Your Honor thinks that

12  that's an issue, obviously, a motion to dismiss survived

13  that's something that potentially could be dealt with.  It's

14  also something that could be dealt with in the arbitration.

15  But I respect Your Honor is asking a hypothetical question --

16          THE COURT:  I am.

17          MR. MARTIN:  And you can probably tell I'm

18  squirming a bit because I don't want to even give any

19  credence at all for the fraudulent transfer causes of action.

20  But setting that aside, I understand Your Honor's point and

21  the questions.

22          THE COURT:  Okay.  And I haven't had a chance to

23  take a look at any of these provisions that are just coming

24  up in argument so that's why I'm asking questions.

25          MR. MARTIN:  No, that's fine.

1          And I know I've been going for a little bit, so

2    unless Your Honor has any further questions for me, we raised

3    some other issues in the briefing, but I think a lot of them

4    are pretty well covered.

5          Maybe while you're looking at your list, I'll just

6    confer with Mr. Brogan and make sure he doesn't think I

7    missed anything.

8          (Participants confering)

9          MR. MARTIN:  Your Honor, I don't think we have

10   anything else at this time for the Court unless there are

11   questions.  And, obviously, we're happy to come back on reply

12   if there are anything that we need to respond to or any final

13   questions that the Court has after the Plaintiff's arguments.

14          THE COURT:  Thank you.

15          Let's take five minutes.

16      (Recess taken at 11:15 a.m.)

17      (Proceedings resume at 11:30 a.m.)

18      (Call to order of the Court)

19          MS. REILLY:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MS. REILLY:  Again, Wendy Reilly from Debevoise &

22   Plimpton on behalf of the Plaintiffs.

23          On March 20th, 2014 the Supreme Court of the State

24   of New York issued two judgments confirming the arbitration

25   award of nearly $5 million dollars plus interest against

 1 | Pursuit Capital Management, LLC, the general partner of the
 2 | Pursuit hedge fund.
 3 |         Instead of satisfying those judgments, the next
 4 | day the Pursuit general partner filed a Chapter 7 bankruptcy
 5 | here in this Court.  Plaintiffs filed this adversary
 6 | proceeding in February 2016 in order to avoid fraudulent
 7 | transfers and restore misappropriated assets to the estate
 8 | for the benefit of the estate and the Debtors' creditors.
 9 |         Plaintiffs have standing to pursue this action
10 | pursuant to the August 2015 sale order, which was approved by
11 | Your Honor.  Under the sale order, the Trustee, on behalf of
12 | the estate, sold to a group of creditors including the
13 | Plaintiffs and Alpha Beta all rights of the Trustee to pursue
14 | certain legal claims including the claims pursued by the
15 | Plaintiffs in this action.
16 |         Plaintiffs have met the jurisdictional and
17 | pleading requirements for all counts alleged in the
18 | complaint.  Nevertheless, Defendants have made a number of
19 | meritless arguments in an effort to have these claims
20 | dismissed.
21 |         If Your Honor has particular questions you would
22 | like to begin with, I'll be happy to address those first;
23 | otherwise, I can jump into addressing the arguments that were
24 | made today in the briefing.
25 |         THE COURT:  No, I'd like to hear the argument and

1  you can start with the standing arguments to the extent that

2  they've been briefed.  There's certainly a piece of it that

3  has not been briefed.

4           MS. REILLY:  So beginning with standing, there are

5  basically two arguments here.  Defendants argued in their

6  motion to dismiss that the action should be stayed because

7  they had appealed Your Honor's sale order to the District

8  Court.  If Plaintiffs knew that there was no legal support

9  for that position to begin with and it's become only weaker

10 now that the District Court has actually addressed the issue

11 and dismissed the appeal as statutorily moot pursuant to 11

12 U.S.C. 6363(m).  And Your Honor has a copy of that opinion.

13          THE COURT:  And my understanding is that's -- that

14 Judge Andrews' decision has now been appealed to the Third

15 Circuit.

16          MS. REILLY:  That is my understanding as well,

17 Your Honor.

18          THE COURT:  Does that make a difference?

19          MS. REILLY:  I don't think so.  I think it's the

20 exact same argument that it was before.  Those arguments are

21 addressed in our brief.  And I think Your Honor briefly

22 alluded to them when we were here for the status conference

23 in discussing discovery.

24          It's a final order.  Your Honor is able to proceed

25 with that order and implementing that order here in this

1  Court.  And I don't think any -- it's our position it either

2  strengthens or remains the same with respect to those

3  arguments as set forth in the opposition brief.

4           The second argument on standing is that Defendants

5  assert with no basis that Plaintiffs breached the sale order

6  by purporting failing to provide the Trustee with three

7  business days' notice before commencing this action.  That is

8  false.  Plaintiffs did provide the required notice to

9  Trustee's counsel more than three business days before this

10 action was filed.  As a result, the argument should be

11 rejected.

12          Now the Defendants have filed a motion to strike

13 because in responding to the false assertion that we have

14 not, in fact, provided notice we put in the declaration

15 addressing that factual assertion explaining that we had, in

16 fact, provided the required notice.

17          And, essentially, the Plaintiffs are trying to

18 prevent the Court from considering that correction of a

19 factual misstatement.  As Your Honor alluded to during the

20 Defendant's portion of the oral argument, the Third Circuit

21 has held that when a defendant challenges the factual

22 underpinnings of the Court's jurisdiction, the Court may

23 consider information outside the allegations in the complaint

24 in order to resolve the issue.

25          And there's the Gotha case, 115 F.3d 176 at 179,

1  Third Circuit 1997.  And also the Mortensen, Third Circuit,

2  1977 and that's 549 F.2d at 891.

3              THE COURT:  And I only had a chance to glance at

4  the Gotha case, but so is that in the same posture as this

5  one, a motion to dismiss on standing grounds or (b)(1),

6  subject matter jurisdiction?

7              MS. REILLY:  I must admit that I do not recall the

8  exact procedural grounds of that case.  I will make a note to

9  look it up and verify that for you.

10             But I think the point in that case was that, you

11  know, in a circumstance like this where there's a factual

12  allegation the Court can consider other factual information

13  outside the complaint in order to consider and resolve the

14  allegation.  Otherwise, what we would have is basically the

15  Defendants being able to put forth a false accusation in a

16  brief and us not be able to rebut it by correcting the

17  misstatement.

18             THE COURT:  And that's a factual assertion as

19  opposed to a facial challenge.  And what a facial challenge

20  be this Court doesn't have jurisdiction to determine an

21  admiralty issue or this Court doesn't have jurisdiction to

22  determine a particular tort issue.

23             MS. REILLY:  That sounds right, Your Honor.

24             In addition, as we noted in our opposition brief,

25  motions to strike are drastic remedies that are generally

1    viewed with disfavor.  Our view, respectfully, is the Court

2    should simply deny the motion to strike and consider that

3    paragraph 3 in the declaration.  In the alternative, you

4    know, we would think a far more reasonable approach rather

5    than dismissal and striking would be to grant Plaintiff's

6    leave to amend the complaint to remedy any pleading defect

7    that the Court does identify.

8          I'd like to jump back -- if you have other

9    questions on standing.  I'd like to jump back to a couple of

10   stray points that came up during our oral argument so that I

11   can be sure I don't forget to address them before I carry on.

12         One is Defendant's counsel mentioned that in their

13   view the complaint is essentially all about this one

14   particular alleged fraudulent conveyance of over $645,000.00

15   dollars.  I would like it to be crystal clear that that is

16   specifically alleged in the complaint because it is a

17   fraudulent conveyance that we know about.  We know about it

18   only because we subpoenaed those records from the bank in

19   order to find out the facts of that before they were alleged

20   in the complaint.

21         We have stated quite clearly in the complaint that

22   we believe there were other fraudulent transfers which

23   explain the disappearance of the assets from the Debtors'

24   possession before the bankruptcy.  But at this stage, we just

25   -- at the time of filing the complaint and, frankly, even now

1 in the course of very limited discovery, we have not had

2 adequate access to the information about the flow of funds

3 into the Debtor, out of the Debtor, and amongst the different

4 entities within the Pursuit hedge fund to be able to

5 specifically identify in the complaint other transfers of

6 money.

7         Also just to address this carried interest point

8 in the Alpha Beta case in Connecticut.  There's a very

9 important issue, which is a factual issue.  And, so, frankly,

10 this really isn't the motion to dismiss issue.  However,

11 since it's been raised, I do want to address they've raised a

12 factual issue that in the Alpha Beta case there was a finding

13 that, you know, carried interest was not appropriate with

14 respect to the UBS recovery.

15         An analysis of whether carried interest would be

16 appropriate is actually an investor by investor analysis.

17 And so it's a very different factual situation.  In the Alpha

18 Beta case, the argument was that Alpha Beta as an investor

19 had suffered a net loss.  And so what the Court said, quite

20 clearly, in the decision is you, the general partner, don't

21 get to get credit, this 20 percent fee, because you have

22 recouped a portion of the net loss.  You're still in the net

23 loss status and, therefore, it does not trigger the 20

24 percent fee.

25         That is completely a different situation from the

1    situation of the Schneider Plaintiffs.  And the Schneider

2    Plaintiffs, as actually defense counsel acknowledged as part

3    of oral argument were in a net profit situation.  They did

4    receive their investment plus some back.  And, therefore, it

5    is a completely different factual analysis.  If the analysis

6    was undertaken, which we do not know, it should have

7    concluded that any additional money above and beyond the

8    profit that was already identified, whether it be from the

9    UBS settlement or any other funds, should potentially have

10   triggered that 20 percent, which should be going to the

11   general partner.  And so I just wanted to make clear because

12   that is just a completely different situation.

13            I also wanted to respond to defense counsel's

14   argument about the other entities and they're being

15   potentially insufficient specific allegations about the other

16   entities.  And this is similar to a point that I already

17   raised with respect to the information we had available at

18   the time that we pled the allegations in the complaint.

19            What we know is that there's an interrelated set

20   of entities.  They're all owned, controlled, managed by the

21   same two people.  And we know that there's a flow of funds

22   amongst some of them.  We are not able because we've never

23   been given the information to track exactly where the money

24   was going from and to.  That's the point of discovery.

25            And, you know, in terms of the fiduciary duty

1  relationship of those other entities, we have pled both

2  breach of fiduciary duty, as well as aiding and abetting

3  breach of fiduciary duty.  And just to give an example, it

4  may well be the case that one of those entities might not

5  have had a fiduciary duty to the general partner or to the

6  Debtor.

7          Even so, for example, to take Ruth Canelas, we're

8  not arguing that she had a contractual relationship with the

9  Debtor or a fiduciary duty with the Debtor.  But if Ms.

10  Canelas accepted monies that belonged to the Debtor into her

11  personal account for no consideration and those monies were

12  fraudulently conveyed then she may well be liable for aiding

13  and abetting the breach of her husband's fiduciary duty.

14          THE COURT:  But does the lack of specific facts

15  create a problem when we're here on a motion to dismiss if

16  I'm trying to determine in certain instances whether there

17  was enough of an allegation of a breach of a fiduciary duty?

18          MS. REILLY:  We believe that the allegations in

19  the complaint are sufficient to survive on a motion to

20  dismiss.  Once we have further information, we hope through

21  factual discovery, we can refine those and there may well be

22  an argument for summary judgment if, in fact, it turns out

23  that one of those entities never received any funds that

24  should have belonged to the Debtor and just had no role in

25  any of this, but others of them did so be it.

1          It seems quite unfair, given our lack of

2   information which is a huge problem in this case and is

3   alleged in the complaint, to X-out in advance, on a motion to

4   dismiss, one of the entities who for all we know actually was

5   where money's that should have gone to the Debtor had been

6   parked to shield them and led the Debtor to be filed into

7   bankruptcy.

8          In addition, I would say that because all of the

9   entities are owned and controlled by the same two people that

10  does lead to, you know, a different set of situations and

11  that's the sort of unitary interest point that has come up

12  before.

13         I also wanted to address the issue that there are

14  multiple litigations here.  I think Your Honor actually apply

15  addressed it already, but to briefly touch on it, you know,

16  if the judgments had been paid we probably wouldn't be here.

17  And so the issue is we've got four active litigations and, I

18  think, Defendants somewhat disingenuously implied oh, we're

19  not trying to, you know, say that they all have to be

20  dismissed; we're trying to consolidate and sort of get things

21  all together or get things into one arbitration.  I think

22  that's not right.

23         I think what's going here is they're arguing in

24  every jurisdiction everything should be dismissed; motion to

25  dismiss in every jurisdiction, multiple motions to dismiss.

 1  They're trying to get rid of all of these cases so that they

 2  don't have to pay any of the money to the Debtor or its

 3  creditors.

 4          THE COURT:  Well, why couldn't this one be

 5  combined with one of the other cases that are pending?

 6          MS. REILLY:  So each of the four cases actually

 7  addresses slightly different issues.  I think, you know, this

 8  was already addressed a little bit today and also in the

 9  briefing, but this case is really advancing the Debtors'

10  rights and interests.  So in this case it is trying to get

11  back into the estate money's that belong to the Debtor; so

12  this twenty percent fee, for example, and other money's that

13  were transferred elsewhere and should have belonged to the

14  Debtor.

15          In some of the other cases it's really individual

16  cases belonging to the Schneider's, for example, as limited

17  partners and their rights.  So in the Connecticut case, not

18  the Alpha Beta Connecticut case, but the Schneider's

19  Connecticut case.  You know, there they are really trying to

20  say we have an arbitration award already that has entitled us

21  as the limited partners to multi-million dollars from the UBS

22  settlement and that needs to be enforced; give us the money

23  basically.

24          THE COURT:  But that's just an execution?

25          MS. REILLY:  Essentially.  One would hope.  It

1  should have been a very simple execution case, but it's

2  managed to go on for quite some time.  So it's just a totally

3  different procedural posture, but also different streams of

4  money.  That's not what is really at the heart of this

5  particular litigation, so I really think each one stands on

6  its own.

7         I can, you know, address more specifically

8  questions about the differences amongst the four, but we

9  brought them and, you know, of course, they're trying to

10  argue in each one you shouldn't be able to be here; you

11  should be elsewhere.  So the goal is to get rid of all of

12  them so that they don't ever have to pay any money.  So we've

13  brought only the litigations we felt we needed to.  You know,

14  in that case in Connecticut we are very concerned that the

15  money's are just going to disappear and never be paid.

16         Okay.  Switching gears to subject matter

17  jurisdiction.  This really didn't come up today and if you

18  think that it's been adequately addressed in the briefs and

19  you don't have many questions on it I'm happy to go through

20  this more quickly, but in the briefing the Defendants focused

21  a lot on this core versus non-core issue.  And, frankly, on a

22  motion to dismiss the question of whether you can issue a

23  final order or have to do, you know, factual findings and

24  conclusions of law I just think is completely irrelevant, but

25  I'm happy to address it further.

1    THE COURT:  I assume Mr. Martin didn't address it

2  because it's not his strongest argument.  If he wants to

3  address it I'm happy to hear it, but the causes of action are

4  core or they are non-core, but as far as I'm concerned I have

5  subject matter jurisdiction.

6    MS. REILLY:  Very good, Your Honor.  Moving on

7  then to personal jurisdiction.  Now this argument really

8  focuses on a challenge to the Courts exercise of personal

9  jurisdiction over the four Cayman Islands Defendants.  The

10  relevant questions, as we set forth in our opposition brief,

11  are whether these four Defendants have minimum contacts with

12  the United States; that's the Plasane decision 352 B.R. at 38

13  Bankruptcy District of Delaware 2006, and whether the

14  maintenance of this action against those four Defendants

15  offends notions of fair play and substantial justice; that's

16  the AstroPower case 335 B.R. at 317, also a Bankruptcy

17  District of Delaware 2005.

18    Now, as alleged in the complaint at Paragraphs 15,

19  16, 18 and 19 the four Defendants who are organized under the

20  Laws of the Cayman Islands all have their principal offices

21  in Connecticut.  This alone should end the inquiry and

22  establish minimum contacts within the United States.  So, for

23  example, the Plasane case, which I eluded to, there the Court

24  noted:

25    "Defendants admit they are incorporated or have

1          principal places of business in one or the other

2          of Florida and Texas.  As such they, obviously,

3          have minimum contacts with the United States."

4     Indeed, despite their arguments in their motion to

5 dismiss, Defendants and their reply brief, Defendants plead

6 in the UBS complaint, that we discussed earlier, and the UBS

7 litigation that at least two of the Cayman Defendants had

8 their principal places of business in Connecticut.

9     THE COURT:  And that's enough principal place of

10 business to have general jurisdiction as opposed to domicile?

11     MS. REILLY:  It is our interpretation of the law

12 that that would be sufficient.

13     THE COURT:  Well, I'm not sure that specific

14 argument was actually made in the briefs.  This is a portion

15 of the briefs that I thought was a little conclusory.  So my

16 question is what specific -- what specifically gives me

17 jurisdiction over these Cayman Defendants?

18     MS. REILLY:  I would say several things, Your

19 Honor.  I think it's the place of business.  And there may be

20 a factual dispute -- I'm not even sure if there is a factual

21 dispute and I think that was not fully fleshed out in the

22 briefs.  We alleged that they have their principal places of

23 business in the U.S.

24     In the briefing from the Defendants, my

25 recollection is they did not address that head on, they just

1  said they are incorporated in domicile elsewhere and their

2  places of business are elsewhere; something like that or

3  maybe even not that clearly, but, again, I think that's a

4  factual dispute not a motion to dismiss question on that

5  particular issue where.  Even if they don't all operate out

6  of U.S. offices, our argument is that the interrelatedness of

7  the Domestic and Cayman Defendants is sufficient to justify

8  exercising jurisdiction over them, again, particularly given

9  the roles of Mr. Schepis and Mr. Canelas who control the

10 Cayman Defendants, and they reside and work in the United

11 States.

12         The purpose of all of these interrelated entities

13 is to, you know, be passing money that is being invested by

14 people who are in the United States and that's certainly

15 knowing and not a surprise to any of the Cayman Defendants.

16 So, although, we do not know specifically which funds are

17 flowing to and from Cayman Defendants this whole structure

18 was set up in order to support the flow of funds amongst the

19 Domestic Defendants and the Cayman Defendants.

20         THE COURT:  Do you have a case that is close to

21 this factual scenario that's alleged that will tell me that

22 the flow of funds is sufficient for jurisdiction or are you

23 just relying on, you know, the general law that it doesn't

24 offend traditional notions of fair play and substantial

25 justice cause that's an awfully -- without specifics that's

1    an awfully broad standard for me to try to apply to this

2    particular factual scenario.

3            MS. REILLY:  Well, I think in the AstroPower case

4    the Court there said that:

5            "Where a Defendant purposely directed his

6            activities at residences of the forum, his

7            contacts with the forum are sufficient to support

8            personal jurisdiction and any litigation that

9            results from alleged injuries that arise out of or

10           related to those activities."

11           So our view would be that the Cayman Defendants

12   knowingly engaged in business with United States residents.

13   I do think there is one case that specifically talks about

14   even a single transfer of funds with a plaintiff could be

15   sufficient for minimum contact.

16           If you could just give me a second.

17           Okay.  It's actually also in AstroPower which is

18   335 B.R.; this is at 318.  A single transaction with the

19   forum plaintiff will suffice and that's cited in our

20   opposition brief.

21           We did look at the very limited documents that we

22   have to try to even be more specific about the transactions

23   and, unfortunately, we have very little to go on thus far,

24   but we did find, in the documents that were produced by the

25   Defendants in the limited discovery in this case, a May 11th,

1   2012 transfer from the U.S. Based Capital Fund to the Pursuit

2   Capital Master Cayman Ltd., entity.  It's for a very minimal

3   amount; $383.79 dollars designated for trust operations.

4   Then the only other thing we saw was not a direct transfer,

5   but a reference of a transfer from the Capital Fund to DLA

6   Piper's account for over a million dollars for a retainer for

7   one of the Cayman entities.

8           THE COURT:  So which part of the standard does

9   that meet?  Does that meet the general jurisdiction, the

10  specific jurisdiction?  What activity was purposely directed

11  at residents of the U.S. that support jurisdiction?

12          MS. REILLY:  The activity that we're really

13  referencing, for the most part, is the transfer of money's

14  and, you know, unfortunately, I guess the issue is I would

15  like to be able to have a list of 14 different transfers that

16  went back and forth that should have gone to the Debtor, but

17  instead were parked at the Cayman entities, but without the

18  benefit of discovery I can't give that list.  And so we're

19  saying that they're all part of a unitary enterprise.  They

20  are all owned and controlled by the same two people.  They

21  were set up, in part, to deliberately be able to move money's

22  amongst these different entities, but in terms of being able

23  to identify which specific transfers that we think may have

24  been fraudulent conveyances might have been moved to one of

25  the Cayman Island entities at this point without further fact

1  discovery.  We're not able to identify which those were.

2          THE COURT:  So, I'm just making sure that I

3  understand the argument.  Its more the general -- its more

4  the line of cases that says that it does not offend

5  traditional notions of fair play and substantial justice to

6  subject the Cayman Defendants to U.S. jurisdiction because of

7  the unitary enterprise and nature of the entire Schepis,

8  Canelas relationship with these entities and control of these

9  entities; not, necessarily, that there was a specific action

10  directed by the Cayman entities in the U.S.

11          MS. REILLY:  I think that's essentially right.  I

12  guess I would just qualify it slightly.  We don't know now of

13  a specific act that was targeted and so we weren't able to

14  plead that in the complaint.  I'm not saying --

15          THE COURT:  But that's where we are.

16          MS. REILLY:  Right, but it is entirely possible

17  that there were specific acts targeted at us.  So for current

18  purposes that part of the argument is focused on the

19  interrelationship of the parties; the fact that we believe

20  that money's were flowing back and forth and that they were

21  all controlled by those two gentlemen with the addition of

22  the, sort of, minimum contacts argument.  So I think there

23  are two separate points which is the sort of general

24  fairness.  You know, should the Cayman Defendants be shocked

25  to find themselves in litigation in the United States.  I

1  think that's a sort of summary of that line of cases.

2         We would say no, they knew full well that they had

3  U.S. based investors, that they were being managed by people

4  who reside and have their primary places of business in the

5  United States, and that they were accepting and releases

6  funds back and forth to domestic entities all within an

7  interrelated set within Pursuit Hedge Fund.  So it should not

8  be surprising if, and we don't know that, but if they were

9  recipients of some of the fraudulent transferred money and

10 they accepted it they should not be surprised to find

11 themselves in Court in the United States.

12         In addition, an additional layer on top of that,

13 we have these sort of minimum contact based arguments that on

14 top of all of those arguments, but it is separate, we believe

15 it is the case that they actually have their principal places

16 of business here in Connecticut in the same office as the

17 other entities.  It is a factual dispute and so I'm saying I

18 don't think that can be resolved on the motion to dismiss,

19 but we have alleged, and the Defendants have stated in a

20 Court pleading in another action, that at least we've alleged

21 it as to all four of the Cayman Defendants and they have said

22 as to the two Defendants that were at issue there, that were

23 Cayman Defendants, that their principal place of business was

24 in Connecticut.  So, again, if your principal place of

25 business is in Connecticut you should not be shocked to find

1  that you may be sued within the United States.

2           THE COURT:  Thank you.

3           MS. REILLY:  Turning now to the arbitration clause

4  within the limited partnership agreement.  Our argument here

5  begins by saying that none of the Defendants appear to be

6  parties to the limited partnership agreement; thus, they

7  cannot invoke the arbitration clause. In our brief we cite to

8  the Hayes case, 885 F.2d at 1155 Third Circuit 1989 where the

9  Court there states:

10          "The Supreme Court has made it clear that it is

11          the parties to an arbitration agreement who are

12          bound by it and whose intentions must be carried

13          out."

14          Further, even if any of the Defendants were

15  parties to the LPA or somehow covered by its arbitration

16  clause the fraudulent conveyance claims, counts 1 through 3,

17  still would not be subject to mandatory arbitration because

18  those claims arise under the Bankruptcy Code, and New York

19  Law and brought pursuant to the trustees power under the

20  code.  Again, in our brief, we cite the Hayes case there.

21          The quote from the Court:

22          "Claims asserted by the Trustee under Section

23          544(b) are not derivative of the bankrupt.  They

24          are creditor claims that the code authorizes the

25          Trustee to assert on their behalf.  The Trustee

1                    cannot be required to arbitrate its Section 544(b)

2                    claims."

3          We also make the point that it would be against

4    public policy and Congress's intent in enacting the

5    Bankruptcy Code to require arbitration of Plaintiffs' claims

6    in these circumstances.  Plaintiffs have already arbitrated

7    their individual claims as limited partners against the

8    general partner under the limited partnership agreement, and

9    there the general partner was the counter party to the LPA.

10          It was the arbitration award followed by the Court

11   judgments enforcing those awards that lead the Defendants to

12   file bankruptcy for the general partner.  Sending the current

13   claims to arbitration would further delay the ability of this

14   Court to address the allegations of fraudulent conveyances

15   and other unlawful conduct and resolve the outstanding issues

16   of the Debtors' estate.  I think that--

17          THE COURT:  But these claims are different.  I

18   mean you can't have it both ways.  So these are the Debtors'

19   claims and if the Debtor is subject to arbitration then how

20   can it be against the policy, general policies as annunciated

21   in Hayes that it go to arbitration.

22          MS. REILLY:  I completely agree that they're

23   distinct sets of claims and I really think you just have to

24   look at the arbitration agreement. If the clause covered

25   these parties then I would acknowledge that we need to go to

1  arbitration.  So, you know, in the other case, in a case of

2  the arbitration, it went to arbitration because it was the

3  limited partners against the Debtor a party to the limited

4  partnership agreement.  Here these Defendants aren't parties

5  to the limited partnership agreement.

6           THE COURT:  Well, certainly -- well, what about

7  the partnership itself; Pursuit Capital Management Fund I,

8  L.P., and the same Opportunity Fund.  Are they covered by

9  arbitration agreement, a provision of the partnership

10 agreement?

11          MS. REILLY:  The agreement appears to be between

12 the general partner and the limited partners.  I certainly

13 acknowledge that there are provisions in here that address

14 the partnership and speak about the partnership, and it is

15 the limited partnership agreement.  So I think it's slightly

16 different with respect to the Capital Fund in its LPA and the

17 Opportunity Fund in its own LPA which is different from the

18 other Defendants, but I think the signatories are --

19 although, we only have an unsigned version -- are the general

20 partner and the limited partners.

21          THE COURT:  Okay.  But the arbitration provision

22 in 1304 of the Pursuit Capital Management Fund I, L.P.,

23 agreement says:

24              "Any controversy between the partnership and any

25              partner or between any partner hereto arising out

1            of or relating to the agreement."

2            So as I'm reading that it's any controversy

3    between the partnership Pursuit Capital Management Fund I,

4    L.P., and any party which would include a general partner.

5    Wouldn't that be subject to arbitration?

6            MS. REILLY:  I suppose the question then would be

7    whether this is a controversy between the partnership and any

8    partner.  So that argument would apply only to the Capital

9    Fund as to its LPA and then whether this is a controversy

10   with a partner.  I suppose my initial thinking on that would

11   be this is an action by the Trustee, not a direct action by

12   the limited partners.  I think that issue would only apply to

13   the Capital Fund and the Opportunity Fund, not to any of the

14   other Defendants, but I see your point that there may be a

15   distinction because of the langue in the arbitration clause

16   about the partnership being referenced there in particular.

17           THE COURT:  Well assume for the moment that, in

18   fact, this arbitration clause effects the Debtor as a general

19   partner and, therefore, the Trustee with respect to at least

20   the non-fraudulent conveyance claims and its claim against

21   the partnership.  I'm going to assume the other arbitration

22   provision is the same.  So at least two of the Defendants

23   would, in that instance, be entitled to arbitration.

24           Is it your argument that there is some policy that

25   I shouldn't send it to arbitration?

1          MS. REILLY:  Yes, if Your Honor found that the

2   Capital Fund and the Opportunity Fund by virtue of this

3   language, not because they're signatories to the LPA --

4          THE COURT:  Right.

5          MS. REILLY:  -- but because of the language in the

6   arbitration clause that those claims should be subject to

7   arbitration, I guess I would have two arguments in response.

8   My first would be that I would ask the Court, respectfully,

9   to exercise its discretion to not make the referral.  I think

10  the Court does have the power to do that under certain

11  circumstances and keep those claims all together.  The vast

12  majority of the claims -- the core of the claims are the

13  fraudulent conveyance claims which are not subject to

14  mandatory arbitration anyway.  Basically, keep the whole case

15  together rather than having the inefficiency, cost and delay

16  of segregating out for just the Capital Fund, and the

17  Opportunity Fund and arbitration as to their issues while

18  handling all of the others for all of the other Defendants in

19  Court.

20          I think my secondary argument would be if Your

21  Honor was so inclined to break them out and have those claims

22  be arbitrated I would then ask, I think, for all claims that

23  are subject to the Courts jurisdiction to go forward first so

24  that we can deal with almost the entire case, and all the

25  fraudulent conveyance issues, and everything else and then,

1  and only then, see if anything else remained that needed to

2  happen in an arbitration context.

3           THE COURT:  Well that's interesting.  So is there

4  case law with respect to the timing of which goes first;

5  matters and arbitration or matters not sent to arbitration.

6           MS. REILLY:  I think the closest case that gets to

7  this type of approach is the APF case which is one of Judge

8  Walsh's cases.  Its 264 B.R. 344 and the relevant discussion

9  is at 361 through 365.  I think it's, at least, somewhat

10 helpful or analogous on this point.  In that case Judge Walsh

11 noted:

12           "That the Bankruptcy Court is the most efficient

13            forum in which to resolve the Bankruptcy Code

14            issues and in that instance declined to stay the

15            adversary proceeding in favor of arbitration."

16           So there had been a request to stay the Court

17 proceeding and, I believe, the Court proceeding moved

18 forward.  That stay request was rejected.

19           I may be conflating two different cases, but I

20 recall that in one of the cases the Judge had done so without

21 prejudice; that might have been the case or I might be

22 conflating two different cases, but there was a case where

23 this issue was decided and the Court decided to maintain

24 jurisdiction and move forward with the Court claims, but

25 without prejudice if at some later point it was determined

1  that certain portions of the claim should be arbitrated.

2          THE COURT:  Let me ask you, how does or why

3  doesn't the fact that the Plaintiffs have plead that this is

4  a unitary enterprise, why doesn't that effect how I should

5  read the arbitration clause and if I find that one of the

6  Defendants, at least, is entitled to arbitration, why

7  shouldn't I say they're all entitled to arbitration?

8          MS. REILLY:  I think that is a hyperbolic

9  expression of the unitary enterprise argument.  It does not

10 follow, we believe, from saying that this is an interrelated

11 set of entities, which it is, that if any one entity signs a

12 contract by doing so it necessarily in every instance binds

13 every other entity to every term within that contract.  I

14 think that's excessive and I don't think that anything in our

15 complaint could be read to suggest that.

16          I do think what we're saying is there is a flow of

17 money amongst the identified Defendants and it is possible

18 that the money that was fraudulently conveyed instead of

19 being available for the Debtors' estate may have been put in

20 all of those entities funds, but that's very different from

21 saying and, therefore, any act by one hundred percent, you

22 know, binds all the others in every single instance including

23 in terms of contract formation.

24          I think the clear state of the law with respect to

25 who is bound by an arbitration clause in a contract is the

1   people bound are the parties to that contract and to that

2   arbitration clause; subject to Your Honor's point that if the

3   arbitration clause, itself, identifies some other party that

4   may come into play like the Capital Fund or the Opportunity

5   Fund, but the law is if you want to find out who's bound by

6   an arbitration clause you look at the parties to that clause.

7   So these other entities are not parties to this contract.

8   They could have some completely different contract that says

9   jurisdiction is going to be in the State Courts of

10  Connecticut and there will be no mandatory arbitration.  I'm

11  not saying that's the case, but there is just no reason to

12  think that because these entities all share a flow of money

13  that means that every contract one signs binds all.

14          THE COURT:  So you're really looking at some of

15  these Defendants as the receptacle of funds that may have

16  funds --

17          MS. REILLY:  Correct.

18          THE COURT:  -- as opposed to necessarily having a

19  direct relationship or a duty to the Plaintiff.

20          MS. REILLY:  Well, some of them, I think, do have

21  a direct fiduciary duty to the Plaintiff.  I don't believe

22  that all of them do, in particular, Ms. Canelas.  We're not

23  alleging that she has her own contractual relationship under

24  the LPA.  She's not a signatory of fiduciary relationship,

25  you know, via the LPA or anything like that.  So --

1          THE COURT:  Okay.

2          MS. REILLY:  A brief note about Defendants

3   argument about the Southern District of New York decision. I

4   think Your Honor has already explored this during your

5   questioning of defense counsel, but I did just want to

6   reiterate that, you know, we do not view that decision there

7   to actually bind the Court or have anything to say about

8   whether this situation that we have in our case means that

9   all claims should be going to arbitration; it was really a

10  very narrow referral to arbitration regarding the arbitration

11  regarding the arbitrability of Defendants *res judicata*

12  defense as Your Honor noted.  The SDNY action was based on

13  violations of the Schneider's individual rights under the

14  LPA.  So it's just a very different situation.  You know, we

15  don't think that that at all suggests that Your Honor is

16  bound to refer all of these claims and Defendants to

17  arbitration because of the Judge's decision there.

18          Moving onto the exculpation clause arguments.  As

19  a preliminary matter, as Your Honor noted, the exculpation

20  clause states that the specified persons "Shall not be

21  personally liable to the partnership or the limited

22  partners," under certain conditions, but it does not limit

23  liability to any and all potential Plaintiffs.  This is not

24  an action by the Capital Fund or by the partnership.

25          Here the Plaintiffs stand in the shoes of the

1  Trustee and the exculpation clause does not apply to claims

2  brought by or on behalf of the Trustee.  But even if it did,

3  it still would not shield Defendants from liability.  Even if

4  all of the Defendants were covered by the definition of

5  affiliate, as Defendants claim in the exculpation clause of

6  the LPA, that still would not justify dismissing the claims

7  against them because the exculpation clause does not provide

8  a blanket protection against litigation; rather, it contains

9  a potential exemption from liability for certain specified

10 entities:

11         "Except,"

12         I'm skipping a little bit,

13         "If they are guilty of fraud, willful misconduct

14         or gross negligence, assuming the complaints and

15         allegations as true,"

16         which must be done at this state,

17         "There likely will be a finding of fraud, willful

18         misconduct and/or gross negligence which will

19         remove any potential protections that might,

20         otherwise, have been provided by the exculpation

21         clause."

22         Now Defendants argue in their reply brief that

23 Plaintiffs did not plead specifically gross negligence, fraud

24 or willful misconduct, but the complaint contains multiple

25 allegations that would satisfy one or more of these

1   standards.  For example, complaint Paragraph 4 alleges that:

2           "Schepis and Canelas secretly transferred to

3           themselves and to Canelas's wife, Ruth Canelas,

4           $645,571.00 in cash, held in the Debtors' bank

5           account, in exchange for no consideration."

6           It goes onto say:

7           "Schepis and Canelas wrongfully appropriated those

8           funds by transferring them first to the Pursuit

9           general partner and then to their personal bank

10          accounts."

11          Complaint Paragraph 47:

12          "Schepis and Canelas transferred those funds in

13          anticipation of those judgments in order to enrich

14          themselves at the expense of the Debtors'

15          creditors."

16          Complaint Paragraph 48:

17          "The transfers were fraudulent and were made with

18          the actual intent to hinder, delay and defraud

19          creditors including the Schneiders."

20          Then complaint 62 and 63:

21          "Alleging that the purported replacement of PCM

22          with Northeast was a complete sham."

23          So assuming these allegations are proven they will

24   provide key facts demonstrating that the Defendants breached

25   their fiduciary duty; at least the Defendants who had

1  fiduciary duties.

2          Now, the Court need not decide whether under

3  Delaware Law a limited partnership agreement could extinguish

4  any and all types of liability even for fraudulent acts

5  because the limited partnership agreement that Defendants

6  claim controls explicitly carves out acts of fraud, willful

7  misconduct or gross negligence from the limitation on

8  liability clause.  In addition to oral argument Defendants

9  referenced Section 3.11 and then referred, but only in part

10  to Section 3.12 on the discussion of whether this LPA has

11  fully extinguished all fiduciary duties.

12          Now if you look at the entirety of Section 3.12 it

13  says, and I actually don't mean the entirety of the whole

14  paragraph, but at least the entirety of the concept that

15  defense counsel referenced subject to the general fiduciary

16  responsibilities of the general partner to the limited

17  partners imposed by this agreement, and that's where defense

18  counsel stopped.  He said, just by this agreement and then

19  said the agreement limits, but it says:

20          "By this agreement, the act and general principals

21          of partnership law."

22          So, you know, we would say that under the

23  agreement it's quite clear that this agreement does not

24  extinguish any and all possible liability for fraudulent acts

25  and, similarly, that the agreement is not the only place to

1   look in terms of what the obligations of the Defendants are.

2        Now the question of whether Defendants acted with

3   gross negligence fraudulently or willful misconduct is one of

4   the ways in which the recent <u>Alpha Beta</u> decision from

5   Connecticut, which Defendants recently submitted to the

6   Court, had some relevance.  In the <u>Alpha Beta</u> case the Court

7   determined that the breaches at issue, which I want to

8   clarify, were primarily focused on breaches of a confidential

9   settlement agreement between <u>Alpha Beta</u> and various Pursuit

10   entities as opposed to the LPA, the confidential settlement

11   embedded within it, by reference certain aspects of the LPA.

12   So the LPA is discussed at certain points, but really the

13   heart of the decision and the focus of that litigation was

14   about breaches of the confidential settlement agreement which

15   is the distinguishing factor.  But in any event, the Court

16   there found that the breaches were:

17        "Both willful and grossly negligent."

18        The Court found that the Defendants there, five of

19   whom are also Defendants in this adversary proceeding:

20        "Knew of the provisions and what their obligations

21        were, and disregarded those obligations primarily

22        so they could retain the benefit of holding the

23        additional funds at a time when they were

24        obligated to remit those funds to the Plaintiff."

25        These findings relate to allegations that are

1 similar to the types of allegations, and actions and conduct

2 that are alleged in the complaint here.

3          Now, Defendants also make several other arguments

4 regarding claims not being well-plead, but I think if I was

5 keeping track they weren't referenced here in the oral

6 argument and I think defense counsel just referred Your Honor

7 to the briefing.  I'm happy to take the same approach if you

8 have specific questions about those other arguments like

9 aiding and abetting, unjust enrichment, but I'm happy to not

10 address those.  I think they're adequately addressed in the

11 briefing.

12          THE COURT:  No, I don't need argument on the

13 unjust enrichment or the aiding and abetting arguments.

14          MS. REILLY:  Okay.  Well then, for the reasons

15 discussed today and set forth in Plaintiffs' opposition to

16 the motion to dismiss we believe the arguments advanced by

17 Defendant should be rejected, the motion to dismiss and the

18 motion to strike should be denied, and I don't have any

19 further specific points that I wanted to bring to Your

20 Honor's attention, but I'm happy to answer any further

21 questions Your Honor may have at this time.

22          THE COURT:  You've probably already addressed

23 this, but I want to ask it more generally.  What is the

24 significance or when do I have to pay attention to the

25 unitary enterprise argument and when should I ignore it?

1          MS. REILLY:  Um --

2          THE COURT:  Not the argument, the factual --

3          MS. REILLY:  Right.

4          THE COURT:  -- assertions.

5          MS. REILLY:  Why and where is it relevant?  It

6   seems like the two places where it's come up most, and I'll

7   start, I guess, with the -- ignore it; although, I'm not

8   really urging Your Honor to ignore it.  I just don't think it

9   is applicable.  The place where the ignore it issue comes up

10  is with respect to the arbitration provision and who is and

11  is not a party to the LPA.

12          I believe that Defendants position is that we

13  can't have it both ways.  We can't, on the one hand, allege a

14  unitary enterprise and on the other hand claim that because

15  the other parties aren't signatories to the LPA that they

16  can't be bound by the LPA; it's all or nothing.  We simply do

17  not think that is correct and, actually, were not

18  particularly troubled by that argument.  So I think I

19  addressed it before in your specific response to the

20  questions about the arbitration clause, but that's the place

21  where it comes up.  We're not urging you to ignore it, but

22  we're saying we just don't think it's applicable.  You want

23  to find out who's subject to the arbitration clause?  Look at

24  the clause and look at the signatories to the contract that

25  houses the clause and that will tell you who was bound by the

1  arbitration clause.

2          So the places where I think you should pay

3  attention to the unitary enterprise argument are where I

4  think it really comes up in connection with the motion to

5  dismiss.  I think for the most part it's really a factual

6  issue.  Those are factual allegations and they will be sorted

7  out through discovery and potentially on a motion for summary

8  judgment, but where do they come into play on the motion to

9  dismiss stage, I think, is specifically with respect to two

10 arguments that Defendants are urging.

11          In part, the personal jurisdiction arguments as to

12 the Cayman Defendants there is a piece of that argument where

13 part of our response does relate to this interconnectedness

14 and this inability to sort of just look at a Cayman Defendant

15 and say oh, you know, they're just on their own.  If the

16 Defendants are trying to say you haven't said anything

17 particular about how they may have, you know, accepted

18 money's that should have belonged to the Debtor.  So because

19 you don't have a specific enough allegation about that you

20 should knock us out of the case.  I think that is a place

21 where because of the interconnectedness of all the entities

22 and, again, because it's the same two individuals, Mr.

23 Schepis and Mr. Canelas who are owning and controlling each

24 of the entities including the four Cayman entities, that has

25 relevance to that argument.

1           I think there was also one point, at least during

2   oral argument, where defense counsel made a more general

3   assertion that the complaint isn't specific enough about,

4   basically, what the Cayman entities did wrong.  Again, I

5   think it's a similar response.  In part, I would add that

6   that's not a motion to dismiss argument.

7           It may be down the road that there's a summary

8   judgment argument that as it turns out after discovery,

9   assuming we actually can see where the money went, if one of

10  these Cayman Defendants never got the money, knew nothing

11  about it, played no role; fair enough, but at this point what

12  we know is or what we believe to be the case is there were

13  millions of dollars that should have been sitting in the

14  Debtors' account that vanished.  And other then the

15  $645,000.00 dollars we don't know where it went and that's

16  what we're trying to figure out.  That is one of the reasons

17  we need this discovery, to figure out where did the money go;

18  money that was in the Debtors' account, went out of it and

19  money that should have gone into the Debtors' account, we

20  believe, didn't find its way there and where it was parked we

21  don't yet know.

22          THE COURT:  Thank you.

23          I do have one other question and I'll ask Mr.

24  Martin to address this to.  There was -- one of the basis of

25  the motion to dismiss was that under Cayman Law shareholders

1  cannot ordinarily bring derivative actions for wrong's to the

2  company since the company itself would be the proper

3  plaintiff.  And the notion of a derivative action sort of

4  flowed through at different points the motion to dismiss.  I

5  think the Plaintiffs' response was it's not a derivative

6  action so the Case Law does not apply, but I want to make

7  sure I understand your position on that.

8         MS. REILLY:  Certainly.  I must admit to some

9  level of confusion about that argument.  I am not crystal

10 clear on exactly what they are trying to argue.  They have

11 cited a number of shareholder derivative actions and they

12 have referred, in some instances, to the need to make a

13 demand and the need to -- it may or may not relate to this

14 notice issue they're arguing about whether we gave sufficient

15 notice to the Trustee, but I think the summary of our

16 response to the argument is if your saying this is basically

17 a shareholder derivative action no, it isn't.  So cases about

18 the rules that apply to shareholder derivative actions have

19 no application here.

20        This is a direct action, not a derivative action

21 and it's an action being brought, you know, by the Trustee to

22 enforce the Debtors' rights.  Again, to the extent this

23 demand issue links up to the notice issue then our response

24 would go back to the argument we talked about earlier with

25 respect to standing.  We don't think there were some

1  additional demand requirements.  There was a notice

2  requirement to the Trustee and that was fully complied with.

3  We gave notice to the Trustee.  There was no objection as to

4  the fraudulent conveyance claims or any of the other claims

5  and we proceeded.

6           So, again, if it's a demand type argument we would

7  say that we complied with whatever notice type requirements,

8  but it's not demand in the same way it comes up in a

9  shareholder derivative action.

10           THE COURT:  Thank you.

11           MS. REILLY:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. MARTIN:  Just a few brief points and then I'll

14  get into the question that Your Honor just asked.

15           THE COURT:  Thank you.

16           MR. MARTIN:  On the jurisdictional issue, I think,

17  I want to address one aspect of what was stated on the record

18  today which is that somehow there's a lack of information

19  and, therefore, they're not able to plead certain things.  I

20  think it's worth the Court knowing that there's been

21  discovery in all of these other cases.  The trial with Alpha

22  Beta resulted in the production of lots of documents.  It was

23  put into evidence and it resulted in a decision.  That was

24  brought by Alpha Beta who's, according to Paragraph 8, one of

25  the parties that has an economic interest in here.

1  Presumably they have all of this information.  They can share

2  it with these Plaintiffs.

3         Additionally, Your Honor, just so you know, after

4  the last hearing we did produce books and records, over 5,000

5  pages.  We are continuing in discussions with Plaintiffs over

6  these issues.  They've served subpoenas on banks, and

7  auditors and a variety of other parties and are continuing

8  their effort to collect information, but we've had an

9  arbitration that resulted in two judgments.  We've had a

10  trial without Alpha Beta.  So the idea that there's some

11  information out there that would enable them to plead

12  differently than they have; I mean, they plead this complaint

13  with that knowledge and I assume that they had the ability to

14  look at a lot more information than most plaintiffs have the

15  ability to.  So then you have to turn to Iqbal and Twombly;

16  you know, have they made sufficient pleadings to justify

17  hailing the Cayman entities into Court.

18         I want to make a point that -- you know, I don't

19  want to be alarmist, but, you know, the word that comes to

20  mind is earth-shattering.  I mean these feeder funds and

21  these offshore funds with a parallel Delaware fund it's a

22  common structure and its structured for tax reasons, its

23  structured so that parties can invest, and have funds pulled

24  and managed with both foreign investors and U.S. investors

25  that can then be pulled into a common fund that's managed by

1 someone on Wall Street, but that doesn't necessarily expose

2 either that fund or those investors to the jurisdiction of

3 the U.S. Court for tax or other reasons.

4            So the idea that somehow simply having a manager

5 in New York or in Connecticut that manages an offshore Cayman

6 fund suddenly subjects that Cayman fund to jurisdiction of

7 the U.S. Courts, I think, would be a significant ruling.  And

8 I --

9            THE COURT:  Does those funds usually have their

10 principal place of business in the U.S. in Connecticut?

11            MR. MARTIN:  Your Honor, that's a complex

12 question.  Typically they have, and Judge Genuario's decision

13 actually makes reference to the fact that the Cayman Funds

14 have a third director that's based in the Cayman Islands.  I

15 believe that when they have their board meetings they go down

16 there and conduct them down there.  They have a registered

17 agent down there.  It's just like in Delaware, we have a

18 registered agent.

19            Certainly, the Hertz vs. Friend case that deals

20 with kind of the central nervous system; it's a Supreme Court

21 case that talks about jurisdiction.  The mere presence of an

22 office in Connecticut with managers there, I don't think, is

23 enough to say that a Cayman Fund suddenly is generally in the

24 United States.  That would have wide-reaching ramifications

25 from a tax liability investor standpoint.  You know,

1  respectfully, it would potentially rock the capital markets

2  and the hedge funds to say that just because you sit in

3  Connecticut managing a Cayman Island, or BVI or some other

4  type of structured fund that suddenly all of those funds are

5  going to be subject to the general jurisdiction of the

6  Courts.

7         THE COURT:  Well, why wouldn't those funds then

8  have their principal place of business in the Cayman Islands

9  and not say that it's in Connecticut?

10         MR. MARTIN:  Well, Your Honor, I think that

11  there's been statements made on the record about what was

12  said in another proceeding that wasn't plead in the

13  complaint.  It's the first time I've heard it.

14         THE COURT:  I think it was plead in the complaint

15  that these businesses --

16         MR. MARTIN:  They say their principal office is --

17  I think if you look at the paragraphs they say they have a

18  principal office in -- I'm just -- I have to accept that as

19  true for the purposes of this motion, but these entities are

20  formed under Cayman Island Law.  I've represented many funds

21  of this structure, including some that have been in

22  bankruptcy.

23         You know, I've been down to the Cayman Islands.

24  It's a lot like Delaware.  There is law firms and accountants

25  down there.  They have, you know, Kenneth Dart who is the

1  Styrofoam cup investor, has bought, redeveloped a whole area

2  of property where there are corporate offices and fund

3  service providers.  The businesses operate down there.  The

4  fact that they may have a contract with an investment manager

5  who makes investment management decisions under a contract in

6  New York doesn't necessarily mean that they're in New York or

7  Connecticut.

8         I think that the fact that Your Honor pressed for

9  a decision that says what I'm arguing would be a very

10  significant decision and have not been able to be provided

11  with one is indicative of the fact that this is a significant

12  issue that I don't think should be dealt with likely.

13  Providing a retainer to a law firm to provide legal services

14  -- I don't think $355.00 dollars for trust services, you

15  know, it's just not the kind of thing that I generally think

16  you would be subject to the jurisdiction.  So I don't think

17  that that's a decision that should be dealt with lightly.  I

18  think it's very significant, which is why we raised it.

19         Regarding the argument that we should do the

20  arbitration in reverse where we should try things here and

21  then send whatever is left to arbitration, I think that's

22  contrary to the majority of the Case Law.  The majority of

23  the Case Law, including from the Bankruptcy Courts in this

24  District, hold that when there is an arbitration clause that

25  binds the parties Congress has passed the Federal Arbitration

 1  Act and there is not discretion to not refer it to

 2  arbitration.

 3          So I don't think that it would be appropriate to,

 4  essentially, hold-off sending it to arbitration until you try

 5  everything you want to try.  I think the better course is to

 6  follow the majority of Courts and its exactly what Judge Pfau

 7  did; she stayed everything pending sending that one piece for

 8  arbitration.  It seems to be the way the Federal Courts deal

 9  with this issue.

10          I certainly understand that they want to try their

11  case, but we have a contract that was signed that the general

12  manager is subject to.  They say they're standing here in the

13  shoes of the general partner and that general partner is

14  bound by its agreement to arbitrate.

15          THE COURT:  Well, two questions there.  I'm

16  writing one down so I don't forget it.  What if I find that

17  only the two partnerships who -- I'm assuming the provisions

18  are the same, but I find that the two partnerships that are

19  the Defendants, the funds, the two feeder funds are entitled

20  to arbitration under the agreement because they're being sued

21  by the general partner or former general partner and I were

22  to find that the remainder of the Defendants were not.  Why

23  wouldn't I proceed with the remainder of the Defendants in

24  that instance where I have, what, 10 or so Defendants and I'm

25  only going to send two of them to arbitration?  Why wouldn't

1  I proceed with the other eight?

2          MR. MARTIN:  Well, Your Honor, first off I don't

3  accept that Northeast is not covered by this.  So Northeast

4  Capital is now the general partner so they're, essentially,

5  in the shoes of the Debtor and that provision I pointed out

6  to you suggests they should also go to arbitration.

7          THE COURT:  So maybe I have three questions, but,

8  yeah.

9          MR. MARTIN:  And the point there is that the

10 allegation is that they're the ones that have now benefited

11 from taking the carried interest and that that transfer was

12 incorrect.  So the claims against Northeast are where the

13 money is here.

14          I mean if Your Honor wants to go forward with

15 respect to a $645,000.00 dollar piece of litigation I guess

16 we could do that.  I seems to me like that's not what this

17 case is really about.  This case is about the fact that there

18 was a security settlement for multiple millions of dollars

19 and people are fighting over how those multiple millions of

20 dollars should be divided.  I think if you send the two

21 Capital Funds, and Northeast and the Debtor to arbitrate the

22 $36 million dollar question or $29 million dollars as it's

23 gotten down to, you know, that's the main of this litigation.

24          So I respectfully submit that the better approach

25 would be to send that to the arbiter.  Certainly, if Your

1   Honor wants to address some of the issues that have come up

2   in requests, you know, your referral might be able to

3   indicate that you would like it to be consolidated or dealt

4   with in the context of the same parties that are there from

5   Judge Pfau.  It certainly makes sense to me to try to keep it

6   consolidated.

7           THE COURT:  No, I don't think I'd touch that or go

8   anywhere near that.

9           MR. MARTIN:  So if you don't want to do that

10  that's fine to.  I'm not suggesting it; it's just something

11  that -- these are the same facts and, you know, Rule 42 deals

12  with consolidation of actions.

13          THE COURT:  Parties had -- parties including the

14  Defendants had options with respect to what they would do

15  when a complaint was filed here.  So far this complaint is

16  still here.  So I don't know, really, what to do with that.

17          MR. MARTIN:  Well, I would say that in that I

18  would urge the Court to follow the relevant contractual

19  provisions, the Act of Congress and the decisions of the

20  Third Circuit and send it to arbitration.

21          THE COURT:  What about the fact -- you said

22  something in your argument about the fact that the Debtor was

23  a former partner.  I don't think I wrote down what you said -

24  - well, so let me ask this.  As a former partner, are they

25  bound by this arbitration agreement provision?

1          MR. MARTIN:  I would submit yes.  I mean they were

2     a party to the contract at the time the conduct alleged

3     arose.  So I would say that, certainly, if you're going to

4     challenge the general partners ability to assign its general

5     partner roles to a different entity that's a dispute between

6     parties to limited partnership agreement.  A general partner

7     signed the agreement.  There's not the word current in the

8     language. It says:

9               "Any dispute between parties to this agreement."

10              Certainly, the Debtor was a party to this

11     agreement.  The limited partners were a party to this

12     agreement.  And the partnership is covered by the clause.  I

13     submit that under Section 204 Northeast is covered by the

14     clause.  So I think they're all covered by the clause is how

15     I would answer that question, Your Honor.

16              THE COURT:  That would be my inclination and,

17     unfortunately, I didn't write down what you said that made me

18     think that was inconsistent with something you said.

19              MR. MARTIN:  I'm certainly happy to order the

20     transcript and send it over if Your Honor would like.

21              THE COURT:  No, I'll find it when I get the

22     transcript.

23              MR. MARTIN:  I just wanted to touch briefly on a

24     couple more points including answering Your Honor's question.

25              On the exculpation issue, you know, conclusory

1   statements like secretly, wrongfully, anticipation of

2   judgments those don't seek and do not assert claims or causes

3   of action for fraud, willful misconduct or gross negligence.

4   They're rhetorical conclusory statements stated in the

5   factual background.

6            The relief sought is not for the types of things

7   that are accepted from the exculpation clause.  We cite in

8   our briefs, you know, if you're going to say that you're

9   suing for fraud you have to plead a complaint under Rule 9,

10  allege scienter and sue for fraud.  None of the causes of

11  action are for fraud.  So I appreciate that they've sought to

12  point out words within their complaint that they think

13  justify the standard, but I submit that the relief that

14  they're seeking and the causes of action that they've

15  asserted do not satisfy those accepted provisions.

16           One point on the Alpha Beta decision.  There was a

17  statement that Judge Genuario found similar type conduct in

18  the Alpha Beta lawsuit, but that was not under the limited

19  partnership agreement; that was under a specific separate

20  agreement between Alpha Beta, a confidential settlement

21  agreement.  So to say that the Judge made findings under a

22  separate agreement that should justify the exclusion here, I

23  think, is incorrect.

24           Your Honor asked two final questions and then I'll

25  submit myself to any final ones you may have.  You asked when

1   should you avoid the unitary jurisdiction and when should you

2   pay attention to it.  What I heard in response is for

3   jurisdictional purposes we want to make the unitary

4   allegation, but for the arbitration and exculpation

5   provisions we don't want you to pay attention to it.  For the

6   liability we want you to pay attention to it because we want

7   to get everybody, no matter where anything has gone, but for

8   exculpation we don't want to pay attention to it.  So if it

9   gets us in the door pay attention to it, but if it kicks us

10  out the door don't, if it gives us liability pay attention to

11  it and if we're exculpated from that liability don't pay

12  attention to it.

13          With all due respect, you know, we responded to

14  the complaint as plead.  They plead a unitary theory, I

15  think; you can't ignore it.  We've argued why if you don't

16  ignore it the case should be dismissed.  If Your Honor does

17  decide to ignore it then I think there's a lot more work to

18  do in parsing out certain Defendants.  You're going to have

19  to grant motions to dismiss against the Cayman entities.

20          These fiduciary duties that have been alleged

21  against the fact that a broker/dealer that doesn't have a

22  contract with the general manager it's not plead -- I mean

23  the general partner, Debtor, how are there fiduciary duties?

24  There's no privity of contract.  There is no -- they haven't

25  plead other than the unitary theory how any of these entities

1 have a fiduciary duty to the Debtor or general partner.

2          We cited to <u>CML vs. Bax</u>, a Delaware Court decision

3 which says when you're dealing with a Delaware LLC, which is

4 what this Debtor is, the parties to whom that entity -- the

5 parties that owe a fiduciary duty to that entity are the

6 managing members; that's Mr. Canelas and Mr. Schepis.  So if

7 you're going to ignore it then -- you know, they may not like

8 to hear me say it, but everybody, but, essentially, the two

9 of them has to go because there is no other legal theory for

10 liability plead in the complaint.

11          Finally, Your Honor, dealing with the Cayman

12 issues I think that, again, it really kind of goes to this

13 unitary theory. I mean the Debtor here doesn't have a

14 relationship with the Cayman entities that's been plead in

15 the complaint.  So to say that somehow there is a cause of

16 action against those entities, freestanding, I think the Case

17 Law that we cited says in order for that to happen they have

18 to go down to the Cayman Islands and get permission and leave

19 of the Cayman Court to be able to prosecute an action.  The

20 cases that we cited indicate that when you don't do that the

21 case should be dismissed.

22          THE COURT:  Those are for derivative actions.

23 Those aren't for direct actions.  I mean if there's no direct

24 action there's no direct action.

25          MR. MARTIN:  Right.

1          THE COURT:  I'm not sure you moved on that ground.

2          MR. MARTIN:  Well, you know, a lot of this gets

3   tied up in how they want their complaint to be construed.  To

4   the extent that their complaint is we're asserting direct

5   actions against the Cayman entities then there's a big

6   jurisdictional problem.  To the extent they're asserting

7   claims against the Cayman Island entities by virtue of their

8   rights that are, as general partner, derivative of being a

9   general partner of each one of these various funds and having

10  some kind of derivative relationship I respectfully submit

11  that that's a derivative action.  The money that they would

12  collect from those Cayman entities goes, in their theory, to

13  the benefit of the creditors of this estate.  To me that

14  sounds like a derivative action.  Obviously --

15         THE COURT:  Well, that's not a derivative action.

16  If a trustee brings a cause of action and the funds come into

17  the estate the fact that they ultimately go out to creditors

18  doesn't make the trustee's action a derivative action.  How

19  does that make it a derivative action?

20         MR. MARTIN:  Well, let me say it differently

21  because I'm probably not articulating it very well.

22         THE COURT:  Okay.

23         MR. MARTIN:  A derivative action means that your

24  claim against someone derives from something other than from

25  your direct privity or direct action.

1          THE COURT:  Okay.

2          MR. MARTIN:  So to the extent that they're

3   alleging some generalized unitary action and that there,

4   therefore, is some generalized fiduciary duty the law on

5   fiduciary duty says if that's brought on behalf of that

6   corpus of beneficiaries it, therefore, derives -- the action

7   actually belongs to the Cayman entities, or belongs to the

8   Debtors' estate or the corporate entity.  To the extent

9   recovery derived from that relationship for the benefit of

10  other participants to that relationship its derivative.

11         So what I'm saying is the way they have plead

12  this, while not traditionally a shareholder who invested in a

13  Cayman fund, in my mind it invokes the same issues that they

14  are seeking to assert aright against a Cayman entity that

15  they do not have a direct contractual relationship with and

16  they are, therefore, asserting claims that derive from some

17  other relationship that's sort of based on this unitary that

18  they plead.  We cited Case Law that says they should get

19  leave of the Cayman Courts to be able to prosecute that.

20         THE COURT:  I understood the Case Law.  What I was

21  trying to do -- I understood what you say the Case Law says

22  because I haven't read all those cases, but I'm assuming it's

23  correct.  I understand that concept, but I'm trying to apply

24  it to the complaint and that's where I'm losing the argument.

25         MR. MARTIN:  Well --

1          THE COURT:  So if the Debtor -- let's take the

2   Plaintiffs out for a minute and just say the Debtor LLC was

3   suing and the Debtor LLC was suing -- Debtor general partner

4   was suing Pursuit Capital Management Fund, that suit wouldn't

5   be derivative, would it?

6          MR. MARTIN:  I guess the problem that I have is

7   that I don't understand how the Debtor would have a non-

8   direct claim against that entity.  And so I would think that

9   that lawsuit would plead a direct claim.  Here, the lawsuit

10  pleads a unitary interest that creates some type of fiduciary

11  duty.  I don't know whether it's governed by Cayman Law or

12  Delaware Law, but they've alleged that because of this

13  unitary nature they have a breach of fiduciary duty claim

14  against the Cayman Island entities.

15          I don't understand how that arises because they

16  don't plead that there's a contract that was signed between

17  the Debtor and those Cayman entities.  They don't plead what

18  the relationship was between the Debtor and those Cayman

19  entities.  They don't say what funds were transferred to and

20  from the Debtor, not other funds, the Debtor and those Cayman

21  entities.  I don't understand how there could be a direct

22  claim.  So if there's no direct claim it should be dismissed,

23  but if you're going to keep it, it must be derivative because

24  what else is there and if it's derivative then the Case Law

25  that we cite applies.

1            THE COURT:  So let's take it out of these facts

2  for a minute.  I just want to make sure I'm understanding

3  because I did have difficulty with this derivative argument

4  throughout the briefing.

5            So if a Debtor were to sue a contract party on a

6  preference action, direct cause of action, if the defendant

7  who the Debtor was suing transferred the money to somebody

8  else under 550 the Debtor could go after the somebody else.

9  No direct relationship between the somebody else and the

10  Debtor, but they're a proper defendant under 550.  There is

11  something there.  I'm not saying it's a fiduciary obligation.

12  There is a direct, I would say direct cause of action against

13  the somebody else who has the funds.

14            Okay.  If the Debtor were a shareholder in a

15  company and it wanted to sue that company's officers and

16  directors, and the company didn't do it, and the Debtor moved

17  for permission that would be a derivative action.  Fit that -

18  - try, in that context, cause I'm not getting it yet, to tell

19  me how this is derivative.

20            MR. MARTIN:  Okay.

21            THE COURT:  I've got a whole chart here of my

22  guides.  So how do I get from where to where.

23            MR. MARTIN:  Okay.  So I'm going to do the best I

24  can and I know it's confusing, and I appreciate it, so I'm

25  going to try.  So the parallel to your 550 action would be

1  what I was saying which is there's some kind of direct claim.

2  I view the 550 action as a statutory direct claim because

3  Congress has said you can go after that ultimate transfer.  I

4  characterize your I'm a shareholder of an entity so I can go

5  after the officers and directors of that entity, and that

6  entity for aiding and abetting as a derivative claim, and

7  more akin to what's been plead here which is I don't have

8  direct claims, but because of the unitary nature of all of

9  these parties I'm, in essence, entitled to sue on behalf of

10 whoever I want to sue which is, although, I, as general

11 partner Debtor, don't have direct claims against you because

12 of the way these funds are structured I'm entitled to bring

13 some kind of common law cause of action against you that I'm

14 saying is a cause of action a foreign entity in a common law

15 jurisdiction where the Case Law says your supposed to get

16 permission from the Courts to be able to bring those actions.

17          THE COURT:  Okay.  So the Debtor here has a direct

18 relationship with the Capital Fund, right?  It's the general

19 partner?

20          MR. MARTIN:  Correct.

21          THE COURT:  It has, as part of a limited

22 partnership agreement, it has a direct relationship with the

23 Capital Fund, but when I go to the Capital Master Fund, which

24 is a Cayman Fund, it looks like the Capital Fund feeds into

25 the Capital Master Fund.

1          MR. MARTIN:  That's correct.

2          THE COURT:  Right?

3          MR. MARTIN:  Yes, it's a feeder fund.

4          THE COURT:  So are you saying that when the Debtor

5   sues the Capital Master Fund, Pursuit Capital Master Cayman

6   Ltd., when the Debtor sues that Fund it doesn't have a direct

7   relationship, there's no contractual or otherwise.  It

8   doesn't have some sort of Common Law or Statutory 550 ability

9   to sue that entity.  So that it's really suing through the

10  Capital Fund.  Its derivative of whatever right the Capital

11  Fund would have to sue the Capital Master Fund?

12         MR. MARTIN:  I think that's a fair way to

13  characterize it.  I mean, I probably wasn't as precise as

14  Your Honor has been because I'm focusing on this unitary, but

15  if you wanted to connect the dots I think that's a reasonable

16  way to do it, yes.

17         THE COURT:  Okay.  I'm going to let Ms. Reilly

18  respond to that.

19         MR. MARTIN:  Okay.  I didn't have anything else

20  unless Your Honor -- I wanted to make sure I answered all

21  your questions and, hopefully, I've done so.

22         THE COURT:  So the fact that here the Debtor has

23  assigned its claims, sold its claims, doesn't really factor

24  into that analysis because what the Plaintiffs are bringing

25  are the Debtors' claims; so it's still the same analysis.

1    MR. MARTIN:  Yeah, and that argument we're

2  assuming, as plead, that they're asserting the Debtors'

3  claims.

4    THE COURT:  Thank you.

5    So, Ms. Reilly, why isn't that derivative action

6  analysis that we just went through, why isn't that correct?

7    MS. REILLY:  It seems to me that it falls into the

8  other category.  It's more like the 550 example.  We do

9  allege 550 here as well, but it's if the one entity

10  transferred the funds to the other there should be a direct

11  ability to come after the entity that made the transfer and

12  the entity that received the transfer.

13    Also, just addressing specifically the

14  hypothetical or semi-hypothetical about now sort of bringing

15  the relationship between the Capital Fund and the Capital

16  Master Fund.  According to our complaint the Capital Fund

17  holds approximately ninety percent of the interest in the

18  Capital Master Fund.

19    THE COURT:  Right.

20    MS. REILLY:  So I don't think it's fair to say

21  there's no direct relationship between those two entities.

22    THE COURT:  No, between those two there is, but

23  between the Debtor and the Pursuit Capital Master Cayman

24  Ltd., is there a direct relationship there or does it run

25  through the ninety percent interest that the Capital Fund has

1 in the Capital Master Fund?

2        MS. REILLY:  I'm not aware of there being a

3 contract between the Debtor and the Capital Master Fund.  So

4 I think it would be more the relationship between the Debtor

5 and the Capital Fund and then that ninety percent interest

6 between the Capital Fund and the Capital Master Fund.

7        THE COURT:  And why isn't that then a derivative

8 action to get from the Debtor to the Capital Master Fund?

9        MS. REILLY:  I still don't conceptualize that as -

10 - I don't know, to me it seems like two totally different

11 questions and maybe I'm just not a hundred percent following

12 Defendants argument here, but the action is by the Debtor.

13 Let's focus on the fraudulent conveyance actions which I

14 think are the core of this whole situation.

15        So the Debtor has a direct action against the

16 Capital Fund if the Capital Fund had money's that should have

17 gone to the Debtor, but instead went to the Capital Master

18 Fund, but also, it seems to me, should have a direct action

19 against the transferee, the recipients, the Capital Master

20 Fund.  I don't see why it converts into a derivative action

21 by virtue of the fact that the Capital Master Fund might be

22 the recipient and doesn't have a contract with the Debtor.

23        THE COURT:  But what about a breach of fiduciary

24 duty claim?

25        MS. REILLY:  So on the breach of fiduciary duties

1  I believe that the way we alleged it in the complaint is that

2  Schepis and Canelas had a fiduciary duty to the Debtor and

3  that the other Defendants owed each other a fiduciary duty.

4  Then, in addition, once the Debtor became insolvent Schepis

5  and Canelas also had a fiduciary duty to the Debtors'

6  creditors.  I think that's a summary of the three types of

7  fiduciary duties that we set forth and, again, that was not

8  alleged against Ruth Canelas that cause of action.

9          THE COURT:  Yeah, I did see that paragraph where

10  you say the other Defendants as entities comprising the

11  unitary interest of the Pursuit Hedge Fund likewise owed each

12  other a fiduciary duty.  So that includes the Debtor there,

13  is what your trying to do with that.

14          MS. REILLY:  And the other.  So basically --

15          THE COURT:  Other Defendants.

16          MS. REILLY:  Right, the Debtor and the other -- go

17  ahead.

18          THE COURT:  Actually, it just says the other

19  Defendants.

20          MS. REILLY:  The first line is there's a fiduciary

21  duty with the Debtor.  I think that phrase is really focused

22  on the Debtors owing -- I'm sorry, the other Defendants owing

23  each other a fiduciary duty.  So, basically, if the Capital

24  Master Fund received funds that should have gone to a

25  different entity they would have had, as fiduciary duty, to

1  treat those funds appropriately and to return them to the

2  entity to whom they belonged.

3           THE COURT:  So this general fiduciary duty runs

4  among all of the Defendants and the Debtor?

5           MS. REILLY:  I think that's right except for Ruth

6  Canelas.  That would be an aiding and abetting violation of a

7  fiduciary duty as to her.

8           THE COURT:  Okay.

9           MS. REILLY:  I had one other quick point.

10          THE COURT:  Yes.

11          MS. REILLY:  I made a note at the same time you

12  said that you had a note that you forgot and so if you would

13  permit me to ask, sort of address that. It may not be the

14  note you made, but it was on this point when you asked a

15  question about who potentially could have to be carved off

16  and go to arbitration, would it just be the Capital Fund and

17  the Opportunity Fund if Your Honor found that way.  I think

18  that defense counsel said no, it would also be Northeast.  I

19  made a note there saying it seems to me there's an

20  inconsistency in the position.  Under the arbitration clause

21  it's -- and, actually, let me just get the language out.  It

22  says:

23          "Any controversy between the partnership and any

24          partner."

25          That's the provision we're looking at now.  I

1  don't think they can have it both ways.  I don't think they

2  can say any partner there means both the Debtor and Northeast

3  at the same time.  I think it has to be one or the other.  So

4  if they're position is that the Debtor has been dumped and

5  Northeast has replaced them then I would say this is not a

6  controversy between the partnership and the Debtor.  So then

7  maybe, you know, it doesn't go to arbitration for that

8  reason, but it seems like they were sort of trying to say no,

9  we want to have it both ways; it's going to cover the Debtor

10  and Northeast because one used to be a general partner and

11  one is now.

12            THE COURT:  Okay.  Thank you.

13            MS. REILLY:  Thank you, Your Honor.

14            THE COURT:  Anything else anyone wants to add?

15            Okay.  I appreciate the argument.  Supplemental

16  briefing.  I haven't heard the Plaintiffs' position on

17  supplemental briefing on the standing issue.  There was

18  something else, I think, we talked about.

19            MS. REILLY:  I think there was Southern District

20  of New York and maybe also whether you're bound by Judge

21  Genuario's.

22            THE COURT:  The effect, if any, of those other

23  decisions.

24            MS. REILLY:  Your Honor, I think supplemental

25  briefing of some type -- I'm not sure exactly what the

1  procedural posture should be would be appropriate.  I think

2  what I would suggest is that the parties, both parties should

3  have the ability to put in briefing addressing whatever

4  issues Your Honor identified today or any others you may

5  identify, but I think I'd like to reserve the right to be

6  able to argue the procedural point, I think, particularly on

7  arguments that could have been made in the motion to dismiss,

8  but weren't made.  That troubles me a little bit and so I

9  think we should both be able to do briefing, but I want to

10  reserve the right to be able to address that in briefing as

11  well.

12            THE COURT:  Okay.  I think that's fair.

13            MR. MARTIN:  I don't have any problem with that,

14  Your Honor.  I mean, I'm kind of sitting here thinking maybe

15  simultaneous briefs rather than -- Your Honor has, obviously,

16  seen a lot of paper and we briefed the standing issue in

17  front of Judge Andrew's already so we have a full set of

18  briefs that we've exchanged.

19            THE COURT:  Why don't the parties talk about what

20  you think is an appropriate schedule and format.  I'm okay

21  with simultaneous and then responding. I like responding

22  briefs because, you know, without the response it's hard

23  sometimes to analyze.  So if you want to do that why don't

24  you all talk and its fine.  I agree you should have the

25  opportunity to address the procedural question and you should

1  talk about how you would like to do that.

2         MS. REILLY:  Thank you, Your Honor.  Just to add,

3  I do think it makes sense, however we work it out, that there

4  be an opportunity to respond so that there can really be a

5  meeting of the issues.

6         MR. MARTIN:  I agree.

7         THE COURT:  Helpful for me.  That's great.  The

8  holidays are coming.  You guys figure out your schedules.

9         MR. MARTIN:  As housekeeping would you like some

10 kind of agreed upon order submitted with the schedule and the

11 --

12        THE COURT:  Why don't you do that?  I think that

13 would be --

14        MR. MARTIN:  You want us to try to hit the issues

15 or --

16        THE COURT:  Yes, why don't you do that and that

17 we're going to be agreed and we're not going to find out that

18 people are briefing different issues.  I think that's a great

19 idea.

20        MR. MARTIN:  So we'll probably order the

21 transcript and then work with Plaintiffs' counsel to come up

22 with something that works.

23        THE COURT:  That sounds great.

24        Okay.  Thank you very much.  We're adjourned.

25        MS. REILLY:  Thank you, Your Honor.

1          MR. MARTIN:   Thank you, Your Honor.   We appreciate

2     all your time this morning.

3          (Court Adjourned)

4

5                              CERTIFICATE

6     I certify that the foregoing is a correct transcript from the

7     electronic sound recording of the proceedings in the above-

8     entitled matter.

9
      /s/Mary Zajaczkowski                    November 30, 2016
10    Mary Zajaczkowski, CET**D-531                       Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25